# In the United States Court of Federal Claims

No. 10-851T
(Filed: December 11, 2013)

| | | |
|---|---|---|
| CHARLES P. ADKINS and JANE E. ADKINS, Plaintiffs, v. THE UNITED STATES, Defendant. | * | Income Tax Refund; Cross-Motions for Summary Judgment, RCFC 56; Theft Loss; IRC § 165; 26 C.F.R. §§ 1.165-1, 1.165-8; Securities Fraud; Pump-and-Dump Scheme; Purchases of Stock Through Innocent Third-Party Brokers; Specific Intent to Deprive Victims of Their Property; Privity; Reasonable Prospect of Recovery; Genuine Issues of Material Fact |

John F. Rodgers, Alexandria, VA, for plaintiffs.

Gregory S. Knapp, United States Department of Justice, Washington, DC, for defendant.

**OPINION AND ORDER**

**SWEENEY**, Judge

Plaintiffs Charles D. and Jane E. Adkins are victims of a fraudulent investment scheme, and seek a refund of federal income taxes based on the losses they sustained due to the scheme. The parties have cross-moved for summary judgment. Plaintiffs claim that the undisputed facts demonstrate that they suffered a theft loss of $2,575,958.19 in 2004, and that they are therefore entitled to a total income tax refund of $317,458. Defendant concedes that plaintiffs incurred a theft loss of $2,336,895.58, but contends that the undisputed facts establish that the balance of the loss claimed by plaintiffs does not constitute a theft loss, and that plaintiffs did not sustain the theft loss in 2004. Thus, defendant argues, plaintiffs are not entitled to the claimed income tax refund. For the reasons set forth below, the court denies plaintiffs' motion and grants in part and denies in part defendant's cross-motion.

## I. BACKGROUND

Donald & Co. Securities, Inc. ("Donald & Co.") was a broker-dealer of securities registered with the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD").[1] In September 1998, Donald & Co. opened a branch office in

[1] The facts in this section are undisputed by the parties.

Garden City, New York. One of the brokers who joined the Garden City office was Otto Kozak. Plaintiffs had begun investing through Mr. Kozak in 1997, when he was working for a different firm, and continued to do so after he joined Donald & Co.

Unbeknownst to plaintiffs, Donald & Co.'s Garden City office was operating a "pump-and-dump" scheme.[2] Broadly speaking, the pump-and-dump operation was accomplished by the office arranging to purchase large blocks of stock in various companies; encouraging its customers to purchase these stocks, artificially inflating the stocks' prices; and then, once the price of a particular stock was sufficiently inflated, selling the stock that it owned, resulting in gains for the office and, due to the subsequent decline in the stock price to a normal, uninflated level, losses for the office's customers. Among the stocks involved in the scheme were five stocks for which Donald & Co. was a market maker; in other words, it held these stocks in its own account to facilitate trading in them. These stocks, also referred to as "house stocks," consisted of Elec Communications Corp. ("Elec"), The Classica Group, Inc. ("Classica"), MyTurn.com, Inc. ("MyTurn"),[3] Great Train Store Co., and Tera Computer Co.

Plaintiffs accorded Mr. Kozak a high level of discretion to trade in their accounts. Some of the trades executed by Mr. Kozak for plaintiffs were done on margin; in other words, using money borrowed from Donald & Co. Mr. Kozak also convinced plaintiffs to participate in the initial public offering ("IPO") of Vianet Technologies, Inc. ("Vianet"). On December 20, 1999, plaintiffs sent a check for $45,000 to Continental Stock Transfer & Trust Company to purchase a subscription in the IPO. However, the IPO was oversubscribed. Thus, in a January 25, 2000

---

[2] As defined by the SEC:

> "Pump-and-dump" schemes involve the touting of a company's stock (typically small, so-called "microcap" companies) through false and misleading statements to the marketplace. These false claims could be made on social media such as Facebook and Twitter, as well as on bulletin boards and chat rooms. Pump-and-dump schemes often occur on the Internet where it is common to see messages posted that urge readers to buy a stock quickly or to sell before the price goes down, or a telemarketer will call using the same sort of pitch. Often the promoters will claim to have "inside" information about an impending development or to use an "infallible" combination of economic and stock market data to pick stocks. In reality, they may be company insiders or paid promoters who stand to gain by selling their shares after the stock price is "pumped" up by the buying frenzy they create. Once these fraudsters "dump" their shares and stop hyping the stock, the price typically falls, and investors lose their money.

SEC, "Pump-and-Dumps" and Market Manipulations, http://www.sec.gov/answers/pumpdump.htm (last updated June 25, 2013).

[3] MyTurn was formerly known as Compu-Dawn Inc.

letter prepared by Donald & Co. on its letterhead, Mr. Adkins requested that Vianet transfer the $45,000 to an escrow account for use in the company's new private placement offering. There is no evidence in the record indicating that the transfer requested by Mr. Adkins occurred. Instead, on December 20, 1999, Mr. Kozak transferred $45,000 from plaintiffs' investment account to plaintiffs' bank account. According to plaintiffs, their accounts at Donald & Co. were never credited with the $45,000 from the check.

Notwithstanding the issues related to the Vianet IPO, the value of plaintiffs' investments with Donald & Co. rose to approximately $3.6 million, with their holdings of MyTurn stock representing most of that value. Beginning in February 2000, however, the value of MyTurn stock began to decline. As a result, the equity in plaintiffs' margin account fell below the required threshold and Donald & Co. began to issue margin calls to plaintiffs. Mr. Adkins instructed Mr. Kozak to meet the margin calls by selling some of plaintiffs' stock holdings, the MyTurn stock in particular. Mr. Kozak did not follow this instruction; rather, he convinced Mr. Adkins to retain the MyTurn stock and meet the margin calls by transferring additional cash and securities to Donald & Co.

Some of the securities transferred by plaintiffs to Donald & Co. to meet the margin calls were Donald & Co. house stocks purchased by plaintiffs through other firms, including Bear, Stearns Securities Corp.; May Davis Group Inc.; and H.J. Meyers & Co., Inc. (collectively, "third-party brokers"). Specifically, through these brokers, plaintiffs purchased MyTurn stock in the amount of $143,617.72, Tera Computer Co. stock in the amount of $26,793.13, and Great Train Store Co. stock in the amount of $40,890. Plaintiffs purchased the latter two stocks at the recommendation of the third-party brokers.

By the beginning of 2002, the value of plaintiffs' investments with Donald & Co. had dropped dramatically. As a result, on February 7, 2002, plaintiffs submitted a statement of claim to the NASD in support of their demand for arbitration against Donald & Co. and three of its principals: David Stetson, Slava Volman, and Steven Ingrassia. Donald & Co. ceased operations on July 24, 2002, due to insufficient capital, and Donald & Co. was expelled from the NASD on March 18, 2003.

In the meantime, on March 17, 2003, one of plaintiffs' arbitration attorneys requested that the NASD adjourn an upcoming arbitration hearing on two grounds: (1) Donald & Co. had not responded fully to plaintiffs' discovery demands,[4] and (2) the attorney and Mr. Adkins had been advised by the United States Attorney that an indictment against the Donald & Co. brokers was forthcoming, at which time the United States Attorney would request that all civil litigation be stayed. Ultimately, the arbitration attorneys advised plaintiffs that they would be unable to proceed with arbitration without discovery and in light of the pending indictment; however, they suggested that the arbitration claim be left open in the event that proceedings in the criminal

---

[4] Plaintiffs object to the use of the word "fully," but that precise word is used by the arbitration attorney in his letter to the NASD.

matter revealed pertinent information. Thus, plaintiffs did not withdraw their arbitration claim at that time.

Ultimately, a federal grand jury in the Eastern District of New York returned indictments against several principals and employees of the Garden City branch of Donald & Co., including Mr. Ingrassia, Mr. Volman, Mr. Stetson, and Mr. Kozak, for conspiracy to commit securities fraud, securities fraud related to the Elec and Classica stocks, and money laundering conspiracy. Mr. Ingrassia and Mr. Stetson were also indicted on money laundering charges.

In September 2004, Mr. Ingrassia and Mr. Stetson agreed to plead guilty to the securities fraud conspiracy, securities fraud, and money laundering conspiracy charges. Mr. Volman agreed to plead guilty to the same charges the following month. The statutory penalties for each charge were described in the plea agreements; in addition to imprisonment and supervised release, the three defendants were subject to fines that could exceed $1.75 million, mandatory restitution in an amount to be determined, and forfeiture. With respect to the latter punishment, the three defendants agreed, pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982, and/or 21 U.S.C. § 853(p),[5] to the entry of forfeiture money judgments against them in which Mr. Ingrassia would forfeit $100,000 to the United States,[6] Mr. Stetson would forfeit $150,000 to the United States, and Mr. Volman would forfeit $300,000 to the United States. In addition to facing criminal penalties for their roles in the securities fraud, the SEC barred Mr. Stetson from acting as a broker or dealer in securities on May 14, 2004, and barred Mr. Ingrassia and Mr. Volman from acting as brokers or dealers in securities on December 7, 2004.

By the end of 2004, neither Mr. Ingrassia, Mr. Volman, nor Mr. Kozak had paid plaintiffs for their losses. Nor had the United States District Court for the Eastern District of New York entered a restitution order.

Criminal proceedings against the indicted individuals continued into 2005 and beyond. For example, in August 2005, Mr. Kozak agreed to plead guilty to the securities fraud conspiracy and securities fraud charges filed against him. Pursuant to his plea agreement, he was subject to imprisonment, supervised release, fines that could exceed $1.25 million, and mandatory restitution in an amount to be determined. Mr. Kozak was sentenced, and judgment against him

---

[5] Mr. Ingrassia and Mr. Volman agreed to the entry of forfeiture money judgments against them pursuant to 18 U.S.C. § 981(a)(1)(C) and 18 U.S.C. § 982, which relate to civil and criminal forfeiture, respectively. Mr. Stetson's plea agreement is not part of the record; nor is it accessible via PACER. However, his forfeiture money judgment was entered pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853(p), the latter of which relates to forfeiture of substitute property.

[6] Although Mr. Ingrassia's plea agreement reflected that he had agreed that a forfeiture money judgment would be entered against him by March 1, 2005, a review of the docket in his criminal case indicates that such a judgment was not entered against him.

issued, in July 2006. As part of his sentence, he was directed to pay restitution in the amount of $631,482.26. However, there is no evidence in the record that Mr. Kozak made any restitution payments before his death in April 2011. Another criminal defendant, Mr. Volman, satisfied the $300,000 forfeiture money judgment entered against him in 2005, and was sentenced in July 2012. As part of his sentence, Mr. Volman was directed to pay restitution in the amount of $3,590,466.50. Mr. Ingrassia was sentenced in December 2009, and was directed to pay restitution in the amount of $4,243,858.44. And, Mr. Stetson, sentenced in March 2011, was directed to pay restitution in the amount of $3,590,466.50. That same year, Mr. Stetson made a $75,000 payment in partial satisfaction of the $150,000 forfeiture money judgment entered against him. The restitution obligations of Mr. Volman, Mr. Ingrassia, and Mr. Stetson were joint and several with each other.

The United States Attorney's Office, having identified plaintiffs as victims of the securities fraud perpetuated at the Garden City branch of Donald & Co., kept plaintiffs apprised of the ongoing criminal proceedings. In an August 12, 2005 letter, the office's Victim Witness Coordinator advised plaintiffs of the charges filed against the Donald & Co. brokers, that they had a right to restitution as provided by law, and that they could follow the criminal proceedings through the Victim Notification System.[7] Then, in a March 31, 2006 letter regarding sentencing proceedings, the United States Attorney's Office advised plaintiffs that they might be contacted by a probation officer to discuss how they were affected by the securities fraud, and requested that plaintiffs complete and return an enclosed "Affidavit of Loss" to the probation officer. Plaintiffs did not submit the affidavit; indeed, Mr. Adkins does not recall receiving the affidavit or being contacted by a probation officer. It appears that because there was no affidavit submitted on plaintiffs' behalf, plaintiffs were not included on the victim list submitted to the federal district court for the purposes of receiving restitution from the convicted Donald & Co. brokers.

While the criminal proceedings were pending, plaintiffs attempted to recoup some of their losses by claiming a tax deduction. Pursuant to section 165 of the Internal Revenue Code ("IRC") and its implementing regulations, taxpayers are permitted to deduct a theft loss from their income in the year that they discover the loss, so long as they have not been compensated for the loss and so long as they do not have a claim for reimbursement for which they have a reasonable prospect of recovery. IRC § 165(a), (c), (e); 26 C.F.R. §§ 1.165-1(a), (d), 1.165-8(a). Accordingly, in 2006, plaintiffs timely filed amended federal income tax returns for 2001 through 2004 reflecting a total theft loss, as calculated by their accountant, of $2,575,958.19. Most of that loss derived from the Donald & Co. pump-and-dump scheme; $2,336,895.58 of the loss was attributable to purchases made through Donald & Co. and $194,062.61 of the loss was attributable to purchases made via the third-party brokers. The remaining $45,000 of the claimed

---

[7] In their supplemental response brief, plaintiffs assert, for the first time, and without evidence in support, that they began to receive victims' rights correspondence in 2004. However, neither the undisputed facts agreed to by the parties nor the record before the court supports the existence of such correspondence prior to August 12, 2005.

loss related to plaintiffs' investment in the Vianet IPO; plaintiffs assert that by failing to credit their investment accounts with the $45,000 from their check and instead transferring $45,000 from their investment accounts to their bank account, Donald & Co. deprived them of $45,000. Plaintiffs claimed the theft loss in 2004, carrying back portions of the loss to the previous three years. As a result, plaintiffs sought income tax refunds of $115,736 for 2004, $24,021 for 2003, $71,621 for 2002, and $177,707 for 2001.

On April 29, 2008, approximately two years after they filed their amended federal income tax returns, plaintiffs withdrew their arbitration claim against Donald & Co. and its brokers. Subsequently, in a December 12, 2008 notice of disallowance, the Internal Revenue Service ("IRS") denied plaintiffs' refund claims for 2001, 2003, and 2004 in the total amount of $317,458.[8] Plaintiffs protested the notice of disallowance at the IRS Office of Appeals. In an April 5, 2011 memorandum, an Appeals Officer concluded that plaintiffs had sustained a theft loss of $2,532,996.01–plaintiffs' claimed theft loss minus the portion of the loss attributable to the Great Train Store Co. and Tera Computer Co. stock purchases through third-party brokers–in 2004, and were therefore entitled to the corresponding refunds. However, at the time the Appeals Officer issued his memorandum, the IRS Office of Appeals lacked jurisdiction to settle plaintiffs' case because plaintiffs had filed suit in the United States Court of Federal Claims. Indeed, plaintiffs filed suit in this court on December 10, 2010, seeking income tax refunds for 2001, 2003, and 2004, in the total amount of $317,458.

Currently, there are no funds available from the convicted Donald & Co. brokers to pay restitution to plaintiffs. In fact, none of the named victims have been fully reimbursed for their losses. Further, there is no evidence that the convicted Donald & Co. brokers possess assets sufficient to pay restitution or any judgment against them.

## II. DISCUSSION

The parties have both moved for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. at 324. Both parties may carry their burden by "citing to particular parts of materials in the record, including

---

[8] Plaintiffs' refund claims for those three years actually totaled $317,464. The origin of the $6 discrepancy in the amounts is unclear.

depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swish, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter. Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues."). Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322. However, if neither party meets this burden on the filing of cross-motions for summary judgment, then the court must deny both motions. See, e.g., Canal 66 P'ship v. United States, 87 Fed. Cl. 722, 723 (2009); Dick Pac./GHEMM, JV v. United States, 87 Fed. Cl. 113, 126 (2009).

Initially, the issues presented by the parties in their motions for summary judgment included whether plaintiffs' investment losses constitute a theft loss pursuant to IRC § 165; if so, whether 2004 is the correct year to allow the theft loss deduction; and, if plaintiffs sustained a theft loss in 2004, what is the proper amount of the income tax deduction and associated refunds. During supplemental briefing, the parties narrowed the issues. Defendant now concedes that most of plaintiffs' investment losses–those attributable to stock purchases made through Donald & Co.–constitute a theft loss. Thus, the issues remaining for the court's resolution are (1) whether the $239,062.61 in losses attributable to purchases through the third-party brokers and to the Vianet IPO constitute theft losses under IRC § 165; (2) whether 2004 is the correct year to allow the theft loss deduction; and (3) if refunds are proper, what are the amounts of those refunds. Deeming oral argument unnecessary, the court addresses each of these issues in turn.

**A. Losses Not Attributable to Stock Purchases Through Donald & Co.**

In general, taxpayers may deduct from their income any unreimbursed loss attributable to theft. IRC § 165(a), (c), (e); 26 C.F.R. § 1.165-8(a). "[T]he term 'theft' shall be deemed to

include, but shall not necessarily be limited to, larceny, embezzlement, and robbery." 26 C.F.R. § 1.165-8(5). Neither IRC § 165 nor its implementing regulations provide any further guidance for what constitutes a theft.[9] However, in most cases, to constitute a theft, the perpetrator must have had the specific intent to deprive the victim of his property. Goeller, 109 Fed. Cl. at 549; Schroerlucke v. United States, 100 Fed. Cl. 584, 598 (2011); De Fusco v. Comm'r, 38 T.C.M. (CCH) 920, 922 (1979); accord N.Y. Penal Law § 155.05(1) (Consol. 2013) ("A person steals property and commits larceny when, with intent to deprive another of property or to appropriate the same to himself or to a third person, he wrongfully takes, obtains or withholds such property from an owner thereof."); Va. Code Ann. § 18.2-178(A) (2013) ("If any person obtain, by any false pretense or token, from any person, with intent to defraud, money, a gift certificate or other property that may be the subject of larceny, he shall be deemed guilty of larceny thereof[.]"); see also Krahmer v. United States, 810 F.2d 1145, 1146 (Fed. Cir. 1987) (holding that the taxpayer was required to prove that the seller of a painting "defrauded him by knowingly and intentionally misattributing the painting to the artist"). In other words, there must be privity between the perpetrator and the victim. Schroerlucke, 100 Fed. Cl. at 598; De Fusco, 38 T.C.M. (CCH) at 922.

Defendant contends that plaintiffs have not established this privity requirement with respect to the losses they incurred that were attributable to the Donald & Co. house stocks they purchased through the third-party brokers and to the Vianet IPO.

**1. Losses Attributable to Stock Purchases Through Third-Party Brokers**

To recover losses arising from the purchases of stock they made through third-party brokers, plaintiffs must establish that the losses were the result of a theft perpetrated by a person or entity that intended to deprive them of their property. Plaintiffs purchased three Donald & Co. house stocks through third-party brokers: MyTurn, Tera Computer Co., and Great Train Store Co. Donald & Co.'s Garden City office manipulated the price of these stocks as part of its pump-and-dump scheme, but the third-party brokers were not involved in the manipulation. Defendant contends that because the stock purchases at issue were not made through Donald & Co., its brokers did not receive plaintiffs' funds for these purchases and could not have intended to deprive plaintiffs of the funds used to make these purchases. In other words, with respect to these purchases, plaintiffs were not in privity with Donald & Co.

---

[9] Most courts analyzing whether a particular criminal act constitutes a theft for the purposes of IRC § 165 refer to state law, but in a recent decision, the Honorable Francis M. Allegra of this court determined that the definition of theft should be derived from federal common law. See Goeller v. United States, 109 Fed. Cl. 534, 549-50 (2013) (holding that "the term 'theft' . . . means the fraudulent taking of property belonging to another, from his possession, or from the possession of some person holding the same for him, without his consent, with the intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking" and includes situations in which "one who obtains possession of property by lawful means . . . thereafter appropriates the property").

Plaintiffs respond that they have established privity for all of the third-party broker purchases. With respect to the MyTurn stock purchases, plaintiffs assert that they purchased the stock from the third-party brokers at Mr. Kozak's recommendation and insistence. Mr. Adkins testified at his deposition that Mr. Kozak recommended that plaintiffs purchase more MyTurn stock when the stock price began to decline, but because plaintiffs had exhausted their margin at Donald & Co., Mr. Kozak instructed them to make the purchases through the third-party brokers where plaintiffs had available margin. Thus, according to plaintiffs, even though they did not purchase the MyTurn stock at issue directly from Donald & Co., Mr. Kozak was the individual responsible for their purchases, and because Mr. Kozak manipulated the price of the MyTurn stock as part of the pump-and-dump scheme, there was an intent to deprive them of the funds used to purchase the stock.

Defendant does not challenge plaintiffs' representation that Mr. Kozak directed the purchases of MyTurn stock from the third-party brokers. Rather, it cites a number of decisions in support of the proposition that to establish the intent-to-deprive element of theft with respect to securities fraud, a victim must show that he purchased the stocks at issue directly from the perpetrator of the securities fraud. The circumstances presented in those decisions, however, are distinguishable from those present in this case. In all but one of the cited decisions, the individuals alleged to have been the perpetrators of securities fraud or other wrongdoing were corporate officers, and the courts concluded either that (1) when an investor purchased his stock on the open market, the corporate officers could not have had the intent to deprive the investor of his property because they did not obtain that property from the investor or, more generally, (2) the investor had not established that the corporate officers intended to deprive the investor of his property. See MTS Int'l, Inc. v. Comm'r, 169 F.3d 1018 (6th Cir. 1999); Bellis v. Comm'r, 540 F.2d 448, 449 (9th Cir. 1976); Schroerlucke, 100 Fed. Cl. at 584; De Fusco, 38 T.C.M. (CCH) at 920; Barry v. Comm'r, 37 T.C.M. (CCH) 925 (1978); Paine v. Comm'r, 63 T.C. 736, aff'd mem., 523 F.2d 1053 (5th Cir. 1975). In the remaining decision cited by defendant, the alleged wrongdoing was perpetrated by an investment company, but related to securities over which the company had no control. See Lombard Bros., Inc. v. United States, 893 F.2d 520 (2d Cir. 1990).

In this case, while it is true that plaintiffs did not purchase the MyTurn stock at issue directly from Donald & Co., they purchased the stock at the direction of one of its brokers, Mr. Kozak, and Donald & Co. owned MyTurn stock and manipulated the price of the MyTurn stock for its advantage. Indeed, Donald & Co. may well have been the seller of the MyTurn stock purchased by plaintiffs through the third-party brokers.[10] In other words, because plaintiffs purchased stock at the behest of one of Donald & Co.'s brokers and Donald & Co. may have been the seller of the stock, the third-party brokers may have acted merely as conduits for

---

[10] One of the third-party brokers from which plaintiffs purchased MyTurn stock–May Davis Group, Inc.–was, like Donald & Co., a market maker for the stock and therefore owned the stock in its own account. However, there is no evidence that the other third-party broker from which plaintiffs purchased MyTurn stock–Bear, Stearns Securities Corp.–was a market maker for the stock.

plaintiffs' funds. See Jensen v. Comm'r, 66 T.C.M. 543, 546 (1993) (noting that "[t]here is no requirement that an investor have direct contact with the entity in which he is investing"), aff'd, 72 F.3d 135 (9th Cir. 1995). Thus, if plaintiffs can demonstrate that they purchased MyTurn stock from third-party brokers that was controlled by Donald & Co.–something about which the record lacks any evidence–then they may be able to establish privity with respect to the MyTurn stock they purchased through the third-party brokers. This is a genuine issue of material fact that precludes the granting of summary judgment to either party.

On the other hand, there is no genuine issue of material fact with respect to plaintiffs' purchases of Tera Computer Co. and Great Train Store Co. stock from the third-party brokers. Plaintiffs assert that they have satisfied the privity requirement because Mr. Kozak was aware of the purchases due to his position as their overall investment advisor. However, Mr. Adkins's deposition testimony vitiates plaintiffs' argument–he testified that he initially purchased the two stocks based on the recommendations of the third-party brokers, not Mr. Kozak. Consequently, Mr. Kozak could not have intended to deprive plaintiffs of the funds they used to purchase these two stocks because he had no role in plaintiffs' decision to purchase those stocks. Accordingly, plaintiffs have not established privity with respect to the Tera Computer Co. and Great Train Store Co. stock they purchased from the third-party brokers. In fact, the facts presented by plaintiffs reflect that there was no privity between plaintiffs and Donald & Co. with respect to these purchases. Defendant is therefore entitled to summary judgment on this issue.

**2. Losses Attributable to the Vianet IPO**

Defendant next contends that plaintiffs must establish privity between themselves and the convicted brokers to recover their claimed $45,000 loss related to the Vianet IPO, but that they have failed to do so because they did not make the $45,000 payment through Donald & Co. Plaintiffs counter that they have established the required privity element because Mr. Kozak recommended that they invest in the IPO, the $45,000 check went to Donald & Co., and Donald & Co. cashed the check without crediting their account with the funds.

Neither party's position is supported by the undisputed facts in the record. There is conflicting evidence regarding who received the $45,000 check and what that person or entity did with the check upon receipt. The check was made payable to Continental Stock Transfer & Trust Company, but there is no documentary evidence in the record concerning to whom plaintiffs sent the check, who cashed the check, and what was done with the funds after the check was cashed. Moreover, Mr. Adkins's deposition testimony on these matters is ambiguous.[11] Because the

[11] See, e.g., Adkins Dep. 71:11-12 ("I sent the money and [Donald & Co.] also charged my account incorrectly . . . ."), 72:10-13 ("[T]he money went to . . . whoever I guess was the legal agent for the IPO that was handling the financial transactions."), 74:8-14 ("I had sent in a $45,000 check and [Donald & Co. was] supposed to send it back to me. Instead, [Donald & Co.] take[s] $45,000 from my own account and send[s] it back to me, so [it is] sending my own money back rather than sending me the new money that was going to the Vianet purchase back to

issue of who had control over the $45,000 check is key to determining whether plaintiffs were in privity with Donald & Co. with respect to the Vianet IPO, the court finds that there is a genuine issue of material fact that precludes the grant of summary judgment to either party.

In sum, the court grants defendant's motion for summary judgment with respect to lack of deductibility of the losses suffered by plaintiffs arising from their purchases of Tera Computer Co. and Great Train Store Co. stock from the third-party brokers, and denies the parties' cross-motions for summary judgment regarding the deductibility of the losses suffered by plaintiffs arising from their purchase of MyTurn stock from the third-party brokers and the Vianet IPO.

**B. Reasonable Prospect of Recovery**

The next issue requiring the court's resolution is whether 2004 is the correct year for plaintiffs' theft loss deduction. As a general matter, a theft loss is allowed as a deduction in the year in which it is sustained, IRC § 165(a), and taxpayers are considered to have sustained a theft loss in the year in which they discover it, id. § 165(e). However, taxpayers cannot deduct a theft loss for which they have been compensated by insurance or otherwise. Id. § 165(a). More particularly:

> [I]f in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained . . . until the taxable year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

26 C.F.R. § 1.165-1(d)(3); accord Parmelee Transp. Co. v. United States, 351 F.2d 619, 627 (Ct. Cl. 1965) ("[T]here can be no deduction if there exists a reasonable prospect of recovery."); Jeppsen v. Comm'r, 128 F.3d 1410, 1418 (10th Cir. 1997) (noting that if the "prospect of recovery was simply unknowable" during the relevant tax year, a taxpayer is "not entitled to take the theft loss deduction" in that year); see also United States v. S.S. White Dental Mfg. Co. of Pa., 274 U.S. 398, 402-03 (1927) (holding that a taxpayer need not establish "that there is no possibility of an eventual recoupment"). Taxpayers bear the burden of establishing their entitlement to a theft loss deduction, Boehm v. Comm'r, 326 U.S. 287, 294 (1945), and therefore

---

me."), 75:14-17 ("That is the check that I paid for the private offering of Vianet . . . that went directly to Continental Stock Transfer & Trust Company. This is the money I sent in. . . . They were supposed to send that back to me. They never sent it back to me. Instead, the $45,000 they sent back to me was subtracted from my own account."), 77:8-14 ("[Donald & Co.] subtracted that from my account. She [sic] should have wired the money back from Continental Stock & Transfer Company [sic], which is where my money went. This $45,000 of my check didn't go to my account. It went to the transfer company that was doing the IPO."), 78:1-2 (stating that he did not know what Continental Stock Transfer & Trust Company did with the $45,000 check and asserting that "[i]t was all controlled by Donald & Company").

are required to demonstrate that they lacked a reasonable prospect of recovery in the year for which they claimed the deduction, Parmelee Transp. Co., 351 F.2d at 628.

"Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances." 26 C.F.R. § 1.165-1(d)(2)(i). The court may consider both objective and subjective factors during its assessment, but must be mindful that a subjective factor, such as a taxpayer's "reasonable and honest belief," cannot be "the controlling or sole criterion." Boehm, 326 U.S. at 292; see also id. at 293 ("The standard for determining the year for deduction of a loss is . . . a flexible, practical one, varying according to the circumstances of each case."). Relevant objective factors include the existence of a claim or pending litigation, see Parmelee Transp. Co., 351 F.2d at 628 (remarking that a court must examine the "probability of recovery" from the claim or litigation, with a "40 to 50 percent or better chance of recovery" being considered sufficient to constitute a reasonable prospect of recovery), and the availability of civil and criminal restitution, see Vincentini v. Comm'r, 96 T.C.M. (CCH) 400, 405 (2008) (holding that it was reasonable to anticipate that a federal district court might order "defendants, if convicted, to pay restitution to their victims . . . and to forfeit property that could be used to satisfy the restitution order"[12]). The court's ultimate inquiry is to determine what a reasonable taxpayer would have concluded about his prospects of recovery in the year of the claimed deduction. Parmelee Transp. Co., 351 F.2d at 628; accord Jeppsen, 128 F.3d at 1416 ("[D]etermination of a reasonable prospect of recovery is a question of foresight.").

Plaintiffs contend that 2004 is the proper year to deduct their theft loss because by the end of that year, they had no reasonable prospect of recovering their losses. In support of their position, they emphasize that by the end of 2004, Donald & Co. was no longer in business; individuals associated with Donald & Co.–including Mr. Kozak, Mr. Stetson, Mr. Volman, and Mr. Ingrassia–had been indicted; the indictments did not refer to MyTurn stock; the plea agreements for Mr. Stetson, Mr. Volman, and Mr. Ingrassia reflected that they would be subject to fines that could exceed $1.75 million, mandatory restitution in an amount to be determined, and forfeiture; Mr. Stetson, Mr. Volman, and Mr. Ingrassia were barred by the SEC from acting as brokers or dealers in securities; they had been advised that the criminal proceedings would stay proceedings on their arbitration claim; and, upon the advice of their arbitration attorneys, they left open their arbitration proceedings with the hope that the criminal proceedings might

---

[12] Plaintiffs appear to believe that funds surrendered by convicted criminals pursuant to forfeiture money judgments would be retained by the government and not be made available to victims as restitution. To the extent that plaintiffs so believe, they are incorrect. Mr. Ingrassia, Mr. Volman, and Mr. Stetson agreed to the entry of forfeiture money judgments against them in accordance with 18 U.S.C. § 982. Section 982 is governed by the provisions of 21 U.S.C. § 853. 18 U.S.C. § 982(b)(1). And, pursuant to 21 U.S.C. § 853(i), the Attorney General is authorized to "restore forfeited property to victims" or "take any other action to protect the rights of innocent persons which is in the interest of justice . . . ." In other words, money forfeited by those convicted of a federal crime may be disbursed to the victims of that crime.

reveal useful information.[13] Based on these facts, plaintiffs contend that there was no prospect of recovery from Donald & Co. or its brokers, either through arbitration or through the criminal proceedings, because Donald & Co. was no longer a viable entity, any funds or other assets in the possession of the criminal defendants would be seized by the United States during the criminal proceedings, and the criminal defendants no longer possessed the means to pay their victims.

Defendant, on the other hand, argues that plaintiffs cannot establish 2004 as the proper year to deduct their theft loss.[14] Defendant focuses on the fact that in 2004, the criminal proceedings against the Donald & Co. brokers were in their initial stages–by the end of 2004, three of the brokers agreed to plead guilty, but no sentences had been announced and no judgments had been entered–and therefore any monetary recoveries from the Donald & Co. brokers had not been determined. In fact, it notes that plaintiffs' broker, Mr. Kozak, did not agree to plead guilty until 2005, and that the first judgment against a Donald & Co. broker–the judgment against Mr. Kozak that directed payment of restitution of $631,482.26–was not entered until 2006. Mr. Ingrassia's judgment, which directed payment $4,243,858.44 in restitution, was entered in 2009; Mr. Stetson's judgment, which directed payment of $3,590,466.50 in restitution, was entered in 2011; and Mr. Volman's judgment, which also directed payment of $3,590,466.50 in restitution, was entered in 2012. Moreover, defendant points out, plaintiffs did not begin to receive victims' rights correspondence from the United States Attorney's Office until 2005, and were not advised of the ability to submit a claim for restitution via an affidavit of loss until 2006. Finally, defendant notes, even though proceedings on their arbitration claim were suspended in 2004 after the Donald & Co. brokers were indicted, plaintiffs did not abandon that claim until 2008 on the advice of their arbitration attorneys. Based on these facts, defendant asserts that plaintiffs retained a reasonable prospect of recovering their losses by the end of 2004.

---

[13] Although plaintiffs note, and it is undisputed that, all of these events occurred during or before 2004, they assert that they were unaware of the existence of many of these events at the time they filed their 2004 federal income tax return. (The court presumes that plaintiffs filed their original 2004 federal income tax return in 2005, but this fact is not documented in the record.) However, neither IRC § 165, its implementing regulations, nor binding precedent requires taxpayers to possess actual knowledge of the facts supporting a lack of a reasonable prospect for recovery during the year in which the prospect for recovery becomes improbable. Rather, as noted above, the court's inquiry is focused on what reasonable taxpayers would have concluded about their prospects of recovery in the year of the claimed deduction. Parmelee Transp. Co., 351 F.2d at 628. When the taxpayers reached that conclusion and the timing of their discovery of the facts that led to that conclusion are of no importance in determining the proper year for the deduction.

[14] Plaintiffs argue that defendant has not established that a year other than 2004 is the proper year for their theft loss deduction. However, it is plaintiffs', not defendant's, burden to establish the proper year of the deduction. Parmelee Transp. Co., 351 F.2d at 628. Thus, defendant need only demonstrate that, in light of the undisputed facts, 2004 is not the proper year for plaintiffs to claim the deduction.

As noted above, the court must examine all of the facts and circumstances to determine whether plaintiffs had a reasonable prospect of recovering some or all of their losses in 2004. It is readily apparent that there are undisputed facts supporting plaintiffs' position that they properly claimed a theft loss deduction in 2004, and undisputed facts supporting defendant's position that plaintiffs were not entitled to a theft loss deduction in 2004. On one hand, by the end of 2004, (1) Donald & Co. had gone out of business, rendering recovery from that entity unlikely, at best; (2) the Donald & Co. brokers responsible for the securities fraud had been indicted, and several of them had agreed to plead guilty to charges that could result in significant fines and forfeiture, thus reducing plaintiffs' ability to recover on a successful civil claim against these brokers; (3) it was reasonable to suppose that plaintiffs would not have been entitled to more than a token amount of restitution because the indictments against the Donald & Co. brokers did not mention MyTurn stock–the stock that was at the center of most of plaintiffs' losses–and because plaintiffs had not received any victims' rights correspondence; and (4) plaintiffs understood that their arbitration proceedings would be stayed for the duration of the criminal proceedings, and that because the criminal proceedings involved numerous defendants and multiple criminal charges, including two types of conspiracies (securities fraud and money laundering), they might have lasted for a long period of time. On the other hand, by the end of 2004, (1) the criminal proceedings against the responsible Donald & Co. brokers were in their infancy, and plaintiffs' ability to obtain restitution from the brokers had not been ascertained; (2) the federal district court had not, in fact, issued any restitution orders, sentenced any of the indicted brokers, or entered any judgments; and (3) plaintiffs had not abandoned their arbitration claim, holding out hope that the criminal proceedings might reveal information that could be useful to them.

Given that the evidence in the record could support both plaintiffs' and defendant's position, the court is prevented from entering summary judgment for either party on the issue. The regulations implementing IRC § 165 clearly state that the determination of whether plaintiffs had a reasonable prospect of recovering some or all of their losses in 2004 is a question of fact. 26 C.F.R. § 1.165-1(d)(2)(I). And, in ruling on motions for summary judgment, the court is prevented from weighing evidence or making findings of fact. See Anderson, 477 U.S. at 249; Contessa Food Prods., Inc., 282 F.3d at 1376; Ford Motor Co., 157 F.3d at 854; Mansfield, 71 Fed. Cl. at 693. Accordingly, the court concludes that whether plaintiffs had a reasonable prospect of recovery in 2004 is a genuine issue of material fact and that neither party is entitled to judgment as a matter of law.[15] As a result, the court cannot address the final issue presented by the parties' motions: the amount of any refunds to which plaintiffs might be entitled.

---

[15] The former conclusion–that plaintiffs' reasonable prospect of recovery in 2004 is a genuine issue of material fact–is further supported by defendant's objection to plaintiffs' proposed finding of undisputed fact that "[p]laintiffs had no reasonable expectation of recovery in 2004." Def.'s Proposed Findings of Uncontroverted Fact & Resp. to Pls.' Statement of Material Facts 4 (addressing plaintiffs' proposed fact number fifty-eight).

### C. Necessity of Further Discovery

Because the court has denied the cross-motions for summary judgment with respect to the deductibility of a portion of plaintiffs' claimed theft loss and the existence of a reasonable prospect of recovery in 2004, plaintiffs request, pursuant to RCFC 56(d), an order directing defendant to respond to certain interrogatories and/or produce records pertaining to (1) the securities fraud and (2) the financial ability of Mr. Volman, Mr. Ingrassia, and Mr. Stetson to make restitution. Plaintiffs assert that all such records are in the government's possession as a result of the criminal proceedings. However, to obtain relief under RCFC 56(d), a party is required to show, "by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition" to the motion for summary judgment. Plaintiffs failed to file an affidavit or declaration in support of their RCFC 56(d) motion. Moreover, in their briefs, plaintiffs do not explain how the requested interrogatory responses or documents would support their tax refund claim beyond the broad, nonspecific contention that the responses and documents might prove their case. Indeed, plaintiffs' document request is overly broad, and the court has no way to evaluate the relevance of the interrogatories for which plaintiffs apparently seek responses because the interrogatories are not included in the record. Accordingly, the court denies plaintiffs' request.

## III. CONCLUSION

In sum, genuine issues remain concerning (1) the deductibility of the losses suffered by plaintiffs arising from their purchase of MyTurn stock from the third-party brokers and their participation in the Vianet IPO, and (2) whether plaintiffs had a reasonable prospect of recovery in 2004. Thus, the court **DENIES** plaintiffs' motion for summary judgment and **GRANTS IN PART** and **DENIES IN PART** defendant's cross-motion for summary judgment. By **no later than Friday, January 17, 2014**, the parties shall file a joint status report suggesting further proceedings.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge