# In the United States Court of Federal Claims

No. 10-851T
(Filed: February 23, 2016)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| CHARLES P. ADKINS and JANE E. ADKINS, | \* | |
| | \* | |
| | \* | Trial; Income Tax Refund; Theft Loss; IRC |
| Plaintiffs, | \* | § 165; 26 C.F.R. §§ 1.165-1, 1.165-8; |
| | \* | Securities Fraud; Pump-and-Dump Scheme; |
| v. | \* | Reasonable Prospect of Recovery; Ascertain |
| | \* | With Reasonable Certainty |
| THE UNITED STATES, | \* | |
| | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

John F. Rodgers, Alexandria, VA, for plaintiffs.

Mark A. Ryan, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiffs Charles P. and Jane E. Adkins are victims of a fraudulent investment scheme, and seek a refund of federal income taxes based on the losses they sustained due to the scheme. There is no dispute that plaintiffs sustained a substantial theft loss. Rather, at issue in this case is whether plaintiffs properly claimed the theft loss deduction for the 2004 tax year, whether a small portion of the claimed theft loss is deductible, and the proper amount of plaintiffs' refund, if any. The court held a trial on all of these issues, after which the parties submitted posttrial briefs. As set forth below, the court concludes that plaintiffs are not entitled to a theft loss deduction for the 2004 tax year. Accordingly, plaintiffs' complaint must be dismissed.

## I. FACTS

This section contains the court's findings of fact as required by Rule 52(a)(1) of the Rules of the United States Court of Federal Claims.[1]

---

[1]  The court derives some of these facts from the parties' Joint Stipulation of Facts ("Jt. Stip."), allegations admitted by defendant ("Compl." and "Answer"), and pertinent statutes and regulations. The remaining facts are derived from the transcript of testimony elicited at trial ("Tr.") and the exhibits admitted into evidence during trial ("PX," "DX," or "JX"). Citations to

Donald & Co. Securities, Inc. ("Donald & Co.") was a broker-dealer of securities registered with the Securities and Exchange Commission ("SEC") and the National Association of Securities Dealers ("NASD").  JX 1;[2] JX 45.  Donald & Co. was directly owned by a holding company, THCG, Inc., and indirectly owned by Star Cross, Inc. and Stephen A. Blum.  JX 45.  One of the brokers employed by Donald & Co. was Otto Kozak.  JX 1.  Mr. Adkins began investing through Mr. Otto Kozak in September 1997, when Mr. Otto Kozak was employed by E.C. Capital, Ltd., and continued to do so when Mr. Otto Kozak moved to GKN Securities Corp. in October 1998 and Donald & Co. in March 1999.[3]  JX 91.  Investment accounts were opened at Donald & Co. for Mrs. Adkins individually, and plaintiffs jointly, in late 1999.  Id.

Unbeknownst to plaintiffs, Donald & Co. was operating a "pump-and-dump" scheme.[4] Jt. Stip. ¶ 1.  Broadly speaking, the pump-and-dump operation was accomplished by Donald & Co. arranging to purchase large blocks of stock in various companies; encouraging its customers to purchase these stocks, artificially inflating the stocks' prices; and then, once the price of a

---

the trial transcript will be to the page number of the transcript and the last name of the testifying witness.

[2]  The parties stipulated that the allegations in the indictment–JX 1–are "true and accurate."  Jt. Stip. ¶ 11.

[3]  Mr. Adkins also dealt with Mr. Otto Kozak's brother, Robert Kozak.  Tr. 430, 432 (C. Adkins).  To avoid confusion, the court refers to the brothers by their full names.

[4]  As defined by the SEC:

"Pump-and-dump" schemes involve the touting of a company's stock (typically small, so-called "microcap" companies) through false and misleading statements to the marketplace.  These false claims could be made on social media such as Facebook and Twitter, as well as on bulletin boards and chat rooms. Pump-and-dump schemes often occur on the Internet where it is common to see messages posted that urge readers to buy a stock quickly or to sell before the price goes down, or a telemarketer will call using the same sort of pitch.  Often the promoters will claim to have "inside" information about an impending development or to use an "infallible" combination of economic and stock market data to pick stocks.  In reality, they may be company insiders or paid promoters who stand to gain by selling their shares after the stock price is "pumped" up by the buying frenzy they create.  Once these fraudsters "dump" their shares and stop hyping the stock, the price typically falls, and investors lose their money.

SEC, Pump and Dump, https://www.investor.gov/glossary/glossary_terms/pump-dump (last visited Feb. 23, 2016).

particular stock was sufficiently inflated, selling the stock that it owned, resulting in gains for the company and, due to the subsequent decline in the stock price to a normal, uninflated level, losses for the company's customers.  Id. ¶¶ 4, 12-46.  Among the stocks involved in the scheme were five stocks for which Donald & Co. was a market maker; in other words, it held these stocks in its own account to facilitate trading in them.  JX 1.  These stocks, also referred to as "house stocks," consisted of Elec Communications Corp. ("Elec"), The Classica Group, Inc. ("Classica"), MyTurn.com, Inc. ("MyTurn"),[5] Great Train Store Co., and Tera Computer Co.  Jt. Stip. ¶¶ 16, 23, 30, 37, 44; JX 1.  Donald & Co. owned much of their house stocks via Odyssey Capital LLC, a holding company.  Tr. 391 (C. Adkins); see also JX 1 (noting the existence of a proprietary trading account funded by Donald & Co. principals in the name of Odyssey Capital LLC and that Donald & Co. accumulated profits from its fraudulent scheme in Odyssey Capital LLC accounts at, among other places, Chase Manhattan Bank).  Mr. Adkins learned of this fact in 2003 or 2004.  Tr. 392 (C. Adkins).

Plaintiffs accorded Mr. Otto Kozak a high level of discretion to trade in their accounts. Jt. Stip. ¶ 8.  Some of the trades executed by Mr. Otto Kozak for plaintiffs were done on margin, JX 91; in other words, using borrowed money.  Mr. Otto Kozak also convinced Mr. Adkins to participate in a private placement offering of Vianet Technologies, Inc. ("Vianet") stock.[6]  Tr. 122 (C. Adkins).  On December 14, 1999, $30,000 was charged to Mr. Adkins's Donald & Co. account to purchase a subscription in the offering.  Jt. Stip. ¶ 85; JX 91 at 1580.  Separately, on December 20, 1999, Mr. Adkins prepared a check for $45,000, made payable to Continental Stock Transfer & Trust Company, to purchase a subscription in the offering.  JX 53 at 823.  It is unclear to whom Mr. Adkins sent the check; at trial he testified:

> I sent the $45,000 in only to hear later–and I sent it to the attorney of record where you have to send the money.  It doesn't go to the broker.  It goes to the company and–at some point I guess it has to go to the company.  So, again, I sent the check in to Otto [Kozak] and he submitted it . . . .

Tr. 122-23 (C. Adkins) (emphasis added).  The check cleared plaintiffs' bank account on January 6, 2000.  JX 53 at 822.

At some point, plaintiff was advised that the private placement offering was oversubscribed.  JX 69.  Thus, in a January 25, 2000 letter prepared by Donald & Co. on its letterhead, Mr. Adkins requested that Vianet transfer the "funds [he] submitted as part of [his] subscription to [Vianet's] private placement offering" to an escrow account for use in Vianet's new private placement offering.  Id.  The record contains no evidence indicating whether the

---

[5]  MyTurn was formerly known as Compu-Dawn Inc.  Jt. Stip. ¶ 12.

[6]  In his testimony, Mr. Adkins used the term "initial public offering."  Tr. 122 (C. Adkins).  However, the documentary evidence in the record reflects that Mr. Adkins was seeking to participate in a private placement offering.  See JX 53 at 823; JX 66 at 1195-96; JX 69.

specified funds referred to the $30,000 charge or the $45,000 check.  With respect to the latter, the record does reflect that on December 20, 1999, Donald & Co. charged Mr. Adkins's account for $45,000 that it sent, via wire transfer, to plaintiffs' bank,[7] JX 91 at 1580, and that there was no corresponding deposit of $45,000 in Mr. Adkins's account, id. at 1578-83.  Ultimately, on March 22, 2000, 19,999 restricted class A shares of Vianet stock were transferred to Mr. Adkins's account; the total value of these shares at the end of March 2000 was $129,993.50.[8]  Id. at 1592.  The record lacks any evidence that plaintiffs have disposed of their Vianet stock.

Notwithstanding the issues related to the Vianet private placement offering, the value of plaintiffs' investments with Donald & Co. rose to approximately $3.6 million, with their holdings of MyTurn stock representing most of that value.  Id. at 1659, 1663.  Beginning in February 2000, however, the value of plaintiffs' MyTurn stock began to decline.  Compare id. at 1663 (reflecting a value of $2,936,250 at the end of February 2000), with id. at 1669 (reflecting a value of $2,131,920 at the end of March 2000), and id. at 1677 (reflecting a value of $1,029,420 in April 2000).  As a result, the equity in plaintiffs' margin account fell below the required threshold and Donald & Co. began to issue margin calls to plaintiffs.[9]  Jt. Stip. ¶ 86.  Mr. Adkins

---

[7]  Although the parties state in their posttrial briefs that Mr. Adkins demanded the return of the $45,000, there is no evidence in the record describing such a demand.  See generally Tr. 122-25 (C. Adkins) (containing the testimony from Mr. Adkins regarding the Vianet stock).

[8]  On October 19, 2000, an additional 598 restricted class A shares of Vianet were transferred to Mr. Adkins's account.  JX 91 at 1602.  On December 27, 2000, all 20,597 shares were transferred from Mr. Adkins's account to Mrs. Adkins's account.  Id. at 1618, 1846.  On January 18, 2002, an additional 31,500 shares of restricted Vianet stock were transferred into Mrs. Adkins's account from an unidentified source.  Id. at 1883.

Separately, on February 7, 2001, 4592 shares of Vianet restricted common stock were transferred into Mr. Adkins's account.  Id. at 1624.  An additional 16,803 shares were transferred into Mr. Adkins's account on April 4, 2001.  Id. at 1627.  None of these 21,395 shares of stock originated from Mrs. Adkins's account.  Id. at 1856-63.

According to a registration statement that Vianet filed with the SEC, as of May 9, 2001, Mr. Adkins owned 52,889 shares of Vianet stock.  JX 66 at 1211.

[9]  The SEC defines "margin call" in the following manner:

If you buy on margin and the value of your securities declines, your brokerage firm can require you to deposit cash or securities to your account immediately, or sell any of the securities in your account to cover any shortfall, without informing you in advance.  The brokerage firm decides which of your securities to sell. Even if the brokerage firm notifies you that you have a certain number of days to cover the shortfall, it still may sell your securities before then.  A brokerage firm

-4-

instructed Mr. Otto Kozak to meet the margin calls by selling some of plaintiffs' stock holdings, the MyTurn stock in particular.  Id. ¶ 87.  Mr. Otto Kozak did not follow this instruction; rather, he convinced Mr. Adkins to retain the MyTurn stock and meet the margin calls by transferring additional cash ($1,074,181.11) and securities (valued at $1,261,082.37) to Donald & Co.  Id. ¶¶ 87-89.

Some of the securities transferred by plaintiffs to Donald & Co. to meet the margin calls were Donald & Co. house stocks purchased by plaintiffs through other firms, including Bear, Stearns Securities Corp. ("Bear Stearns"); May Davis Group Inc. ("May Davis"); and H.J. Meyers & Co., Inc. (collectively, "third-party brokers").  Id. ¶ 82.  Specifically, through these brokers, plaintiffs purchased MyTurn stock in the amount of $143,617.72, Tera Computer Co. stock in the amount of $26,793.13, and Great Train Store Co. stock in the amount of $40,890.00.  Id. ¶ 83.  With respect to the MyTurn stock, plaintiffs purchased 13,200 shares from Bear Stearns, JX 53 at 865-66 (reflecting that 10,000 shares were purchased on May 25, 2000, and 3,200 shares were purchased on August 17, 2000); and 2,000 shares from May Davis, id. at 868-69 (reflecting the purchase of 2000 shares, in four 500-share blocks, on September 13, 2000).  One of the May Davis transaction confirmation slips bore the notation that May Davis was a market maker for MyTurn stock.  Id. at 868.  And, all of the May Davis transaction confirmation slips indicated that plaintiffs' request to purchase the MyTurn stock was not solicited by May Davis.  Id. at 868-69.

By the beginning of 2002, the value of plaintiffs' investments with Donald & Co. had dropped dramatically.  Compare JX 91 at 1659 (reflecting a value of $3,589,300.84 at the end of February 2000), with id. at 1783 (reflecting a value of $9848.62 at the end of December 2001).  Mr. Adkins conducted some research and realized that plaintiffs were being defrauded.  Tr. 28 (C. Adkins).  As a result, on February 7, 2002, plaintiffs submitted a statement of claim to the NASD in support of their demand for arbitration against Donald & Co. and three of its principals:  David Stetson, Slava Volman, and Steven Ingrassia.[10]  Jt. Stip. ¶ 90; JX 42.  In their

---

may at any time change the threshold at which customers are subject to a margin call.

SEC, Margin Call, https://www.investor.gov/glossary/glossary_terms/margin-call (last visited Feb. 23, 2016).

[10]  Plaintiffs were no strangers to the NASD arbitration process.  On February 22, 1999, they submitted a statement of claim to the NASD in support of their demand for arbitration against Philip E. Teseo and Victor M. Wang, who were brokers for Duke & Company, Inc.  DX 15 (rebuttal); DX 17 (rebuttal).  Plaintiffs alleged that Mr. Teseo and Mr. Wang defrauded them of their investments through a pump-and-dump scheme.  DX 15 (rebuttal); Tr. 155, 535, 538 (C. Adkins).  The NASD arbitration panel conducted a hearing, and on February 9, 2000, awarded plaintiffs $572,000 plus interest.  DX 15 (rebuttal).  On January 21, 2001, Mr. Wang was charged in federal court with conspiracy to commit securities fraud.  DX 19 (rebuttal).  He pled guilty that

claim, plaintiffs generally alleged that the respondents manipulated the value of the MyTurn stock, causing them to incur substantial losses; they made no allegations concerning the Vianet stock transactions. JX 42. Mr. Otto Kozak was not named as a respondent; nor was he mentioned by name in plaintiffs' claim. Id. Rather, according to Mr. Adkins, Mr. Otto Kozak was assisting plaintiffs by providing their arbitration attorneys with information regarding Donald & Co. See, e.g., Tr. 57, 327-28, 381-82, 435-36 (C. Adkins); accord id. at 372, 392. Donald & Co. ceased operations on July 24, 2002, due to insufficient capital, Jt. Stip. ¶ 62; JX 1, and Donald & Co. was expelled from the NASD on March 18, 2003, Jt. Stip. ¶ 69.

On March 24, 2003, one of plaintiffs' arbitration attorneys sent a letter to the NASD requesting that the NASD adjourn the arbitration hearing scheduled for April 1, 2003, on two grounds:

> The broker-dealer Respondent, Donald & Co. Securities, Inc. has not responded fully to our demands for discovery and is no longer in business. We have been unsuccessful in our attempts to obtain necessary documents elsewhere. Thus, we would need additional time for discovery in any event.

> There is a more important reason for an adjournment. One of the Claimants, Charles Adkins, has been recently contacted by the Department of Justice, which is investigating Donald & Co. and certain persons associated with it. (We have no information that any individual Respondent is the subject of the Government's investigation.) Mr. Adkins has cooperated with the Government. I have also spoken with Cynthia Monaco, the United States Attorney handling the matter, who has advised me that an indictment will be handed down in the case. We understand the indictment will be handed down in the near future. At that time, Ms. Monaco will ask that all civil litigation involving Donald & Co., including arbitrations, be stayed pending disposition of the criminal case.[11]

---

same date, and was sentenced on December 13, 2002. Id. As part of his sentence, he was directed to pay restitution in the amount of $11,129,582, most of which was to be paid to the SEC on behalf of the victims of the fraud. Id. In the meantime, on January 23, 2001, plaintiffs filed an application to confirm their arbitration award in the United States District Court for the District of Columbia. DX 14 (rebuttal). The district court, in a July 17, 2001 ruling, confirmed and entered judgment on the arbitration award. DX 18 (rebuttal) (Adkins v. Teseo, 180 F. Supp. 2d 15 (D.D.C. 2001)). As of the date of trial, plaintiffs had not collected on the judgment. Tr. 158, 500 (C. Adkins). Plaintiffs' inability to collect on the judgment led Mr. Adkins to believe that the fact of an arbitration award did not mean that compensation would be forthcoming. Id. at 500.

[11] Paragraph 80 of the Joint Stipulation of Facts provides: "The prosecutor told Plaintiffs['] Arbitration attorney that the criminal indictments would stay the arbitration proceedings in March, 2003." Although the parties jointly stipulated to this fact, the court

JX 43 (footnote added); see also DX 38 (rebuttal) (reflecting that Special Agent Kurt F. Dengler of the Federal Bureau of Investigation ("FBI") interviewed Mr. Adkins by telephone on February 28, 2003, regarding the Donald & Co. stock manipulation scheme).  Further, according to Mr. Adkins, the arbitration attorneys advised plaintiffs that they would be unable to proceed with arbitration without discovery and in light of the pending indictment; however, they suggested that the arbitration claim be left open in the event that proceedings in the criminal matter revealed pertinent information.  Jt. Stip. ¶¶ 55, 91; accord id. ¶ 76 (indicating that plaintiffs' arbitration attorneys advised plaintiffs that "the arbitration was trumped" by the indictments).  Mr. Adkins did not object to this suggestion; he testified:

> I only made two payments to my attorneys at the beginning of the case in 2002 . . . . [T]hey were unsuccessful in getting any documents, and I told them I wasn't going to pay them any more and there's no real need to pursue it.  The attorneys were on a contingency basis, so I had paid my money on the front end, and so . . . it was really their decision.

> I left it up to them about continuing and not just dropping the arbitration proceeding, because they had invested in the case and . . . they hoped, I guess, maybe to get something . . . out of the case at some point in time . . . .  So, I did not object when they just kept postponing the case.

> And, in fact, . . . by 2003, there was no real work on the case, other than them responding to the NASDAQ [sic] board about . . . postponing the case.  I guess in 2003, I think there was a plea to get the arbitrators to compel production, but then that was the last real effort of any kind by any of us.

---

accords it little weight.  The letter from plaintiffs' arbitration attorney indicates that the United States Attorney intended to request that all civil litigation be stayed pending the resolution of the criminal proceedings, not that she advised that all civil litigation would automatically be stayed pending resolution of the criminal proceedings.  In addition, at least one arbitration claim against Donald & Co. and one of its brokers remained active during the criminal proceedings.  See JX 49 (Auderer v. Donald & Co., filed on January 21, 2003, decision for claimants on March 16, 2005).

Relatedly, paragraph 70 of the Joint Stipulation of Facts provides:  "The arbitration hearing before the NASD was suspended when the criminal defendant employees of Donald & Company (including Otto Kozak, David Stetson, Slava Volman, and Steven Ingrassia) were indicted . . . ."  Although the parties jointly stipulated to this fact, the court accords it little weight because it is vague.  It is unclear whether the word "when" refers to causation or timing.  And, because the stipulated fact is written in passive voice, it is unclear who or what suspended the arbitration hearing.  Moreover, as demonstrated below, the stipulated fact is inaccurate in that it provides that Mr. Stetson was indicted.

. . . . I know I paid $2,500 to start the case and another $5,000 in – around the end of 2002, and nothing more because it wasn't going to be productive.

Tr. 70-71 (C. Adkins); accord id. at 231-32; see also id. at 71-72 (containing Mr. Adkins's testimony that by the end of 2003, he did not think that plaintiffs would get any money from their arbitration claim); id. at 226-29 (indicating that between 2004 and 2008, plaintiffs' arbitration attorneys requested, upon regular inquiries from the NASD, the continued postponement of the arbitration proceedings). Thus, plaintiffs did not withdraw their arbitration claim at that time. See JX 44 (indicating that the arbitration claim was not withdrawn until April 29, 2008).

Ultimately, in May 2004, a federal grand jury in the Eastern District of New York returned an indictment against several principals and employees of Donald & Co.–Mr. Ingrassia, Mr. Volman, Nicholas Antonelli, Jeffrey Bassin, Carl Cunzio, John Flanagan, Mr. Otto Kozak, Mr. Robert Kozak, and Patrick McFadden–for conspiracy to commit securities fraud, securities fraud related to the Elec and Classica stocks, and money laundering conspiracy. JX 1; JX 2. Mr. Ingrassia and Mr. Volman were also indicted on money laundering charges. JX 1; JX 2. The indictment additionally contained two criminal forfeiture allegations. JX 1. The first, which pertained to the securities fraud charges, indicated that the government intended, upon the defendants' convictions, to seek the forfeiture "of any property constituting or derived from proceeds obtained directly or indirectly as a result of such offenses" pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), or, if necessary, the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). Id. The second, which pertained to the money laundering charges, indicated that the government intended, upon the defendants' convictions, to seek the forfeiture of all property involved in the offenses, as well as all property traceable to that property, pursuant to 18 U.S.C. § 982, or, if necessary, the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). Id. Specifically identified as subject to forfeiture were real property located in Bayshore, New York, and a Carver motorboat, both owned by Mr. Ingrassia. Id.

Mr. Adkins read the indictment in 2004. Tr. 378 (C. Adkins). He interpreted its contents to mean that the government intended to seize any documentation concerning the identity and ownership of the defendants' assets, foreclosing plaintiffs' ability to prove the existence of a theft loss and locate assets that could be used to reimburse plaintiffs for their theft loss. Id. at 29-30, 72. Mr. Adkins further interpreted the indictment to mean that the government was going to seize all of the defendants' assets, preventing plaintiffs from attaching those assets to recover their theft loss. Id. at 29-30, 72, 223-24; see also id. at 72 (describing the indictment as "the last nail in the coffin" with respect to obtaining any recovery on plaintiffs' arbitration claim). However, the record lacks any evidence that the government seized any of the defendants' documents, records, or assets.[12] Further, the record is bereft of any evidence that plaintiffs or

---

[12] As described below, certain defendants did agree to the entry of forfeiture money judgments against them. Mr. Adkins testified that when he used the term "seizure," he was referring to "a forced forfeiture of their assets . . . ." Tr. 517 (C. Adkins).

their arbitration attorneys attempted to ascertain the financial condition of any of the defendants. Instead, relying solely on the contents of the indictment, Mr. Adkins concluded that the government had rendered the defendants judgment proof.[13]   DX 34 (rebuttal).

Moreover, when Mr. Adkins saw the indictment and learned that only the Elec and Classica stocks–and not the MyTurn stock–were named in the document, he was upset and called Special Agent Dengler to express his dissatisfaction. Tr. 61-63, 289, 292, 304-05 (C. Adkins). According to Mr. Adkins, Special Agent Dengler advised him that the FBI and the prosecutors were focused on the money laundering aspects of the case, and not the securities fraud. Id. at 293, 296-97, 304-05; accord id. at 292-93, 509 (containing Mr. Adkins's testimony that Special Agent Dengler stated that the priority of the FBI and the prosecutors was to put people in jail, not to recover money for the securities fraud victims[14]); cf. id. at 62-64 (indicating Mr. Adkins's belief, based on the contents of the indictment and his discussions with Special Agent Dengler, that plaintiffs would never get their money back because (1) the government's focus was on the money laundering, (2) the government was going to take all of the defendants' money through seizures and fines, and (3) the government was going to take all of the defendants' documents that could support plaintiffs' arbitration claim).

Mr. Stetson, another Donald & Co. principal, was charged by information on September 21, 2004. JX 3.  He was charged with conspiracy to commit securities fraud, securities fraud related to the Classica stock, and money laundering conspiracy. Id.; JX 15.  The information also contained two criminal forfeiture allegations. JX 15.  The first, which pertained to the securities fraud charges, indicated that the government intended, upon Mr. Stetson's conviction, to seek the forfeiture "of any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense(s)" pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c) (including, but not limited to, $300,000 in United States currency), or, if necessary, the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). Id.  The second, which pertained to the money laundering charge, indicated that the government intended, upon Mr. Stetson's conviction, to seek the forfeiture of all property involved in the offenses, as well as all property traceable to that property, pursuant to 18 U.S.C. § 982 (including, but not limited to, $150,000 in

---

[13]   In their opening posttrial brief, plaintiffs represent that they "were not able to ascertain the actual financial assets of the Donald [& Co.] malfeasors in 2004–the claimed theft loss year–nor were [they] able to . . . identify financial accounts that might have been sources of funds for restitution or levy." Pls.' Posttrial Br. 12.  To the extent that plaintiffs are suggesting that they attempted to ascertain the defendants' assets but were unsuccessful, they do not provide any citations to the record in support of this proposition.

[14]   Mr. Adkins also testified that neither Special Agent Dengler nor anyone from the government advised him, "in so many words," that "the purpose of federal investigations is to put the guys in jail, not to recover your money[.]"  Tr. 294 (C. Adkins).  This testimony conflicts with his earlier trial testimony, see id. at 292-93, and his deposition testimony, see id. at 294-95. The court therefore discounts it.

United States currency), or, if necessary, the forfeiture of substitute property pursuant to 21 U.S.C. § 853(p). Id. Mr. Adkins was made aware of the criminal case against Mr. Stetson by his arbitration attorneys and Mr. Otto Kozak. Tr. 380-82 (C. Adkins).

In September 2004, Mr. Ingrassia and Mr. Stetson agreed to plead guilty to the securities fraud conspiracy, securities fraud, and money laundering conspiracy charges. Jt. Stip. ¶ 79; JX 2; JX 3. Mr. Volman agreed to plead guilty to the same charges the following month. Jt. Stip. ¶ 79; JX 2. In agreeing to plead guilty, Mr. Ingrassia and Mr. Volman would receive terms of imprisonment and supervised release, and would be subject to fines that could exceed $1.75 million, mandatory restitution in an amount to be determined, and forfeiture. JX 13; JX 14. Although Mr. Stetson's plea agreement is not included in the record or available via PACER,[15] it appears, based on the judgment entered in his case, that his plea agreement mirrored those of Mr. Ingrassia and Mr. Volman. See JX 19. With respect to forfeiture, the three defendants agreed, pursuant to 18 U.S.C. § 981(a)(1)(C), 18 U.S.C. § 982, and/or 21 U.S.C. § 853(p), to the entry of forfeiture money judgments against them in which Mr. Ingrassia would forfeit $100,000 to the United States,[16] Mr. Stetson would forfeit $150,000 to the United States, and Mr. Volman would forfeit $300,000 to the United States. JX 13; JX 14; JX 23. The three defendants' plea agreements remained under seal until August 26, 2005. JX 7; JX 9; see also JX 11 (reflecting that the transcript of Mr. Volman's October 20, 2004 plea hearing was sealed); JX 12 (reflecting that the transcript of Mr. Ingrassia's September 13, 2004 plea hearing was sealed). Nevertheless, Mr. Adkins learned in 2004 from his arbitration attorneys and Mr. Otto Kozak that all of the criminal defendants intended to plead guilty. Tr. 371-72, 380-82 (C. Adkins).

In addition to facing criminal penalties for their roles in the securities fraud, the SEC barred Mr. Stetson from acting as a broker or dealer in securities on May 14, 2004,[17] Jt. Stip. ¶ 78, and barred Mr. Ingrassia and Mr. Volman from acting as brokers or dealers in securities on

---

[15] PACER is an acronym for Public Access to Court Electronic Records, which "is an electronic public access service that allows users to obtain case and docket information online from federal appellate, district, and bankruptcy courts, and the PACER Case Locator." See Administrative Office of the United States Courts, Public Access to Court Electronic Records, https://www.pacer.gov (last visited Feb. 19, 2016).

[16] Although Mr. Ingrassia's plea agreement reflected that he had agreed that a forfeiture money judgment would be entered against him by March 1, 2005, a review of the criminal docket indicates that such a judgment was not entered against him. See JX 2.

[17] The SEC also barred Mr. Antonelli from acting as a broker or dealer in securities on May 14, 2004. See Antonelli, Exchange Act Release No. 49702, 2004 WL 1086008 (May 14, 2004). The court takes judicial notice of this fact pursuant to Rule 201(b)(2) of the Federal Rules of Evidence.

December 7, 2004, id. ¶ 77.[18]  Mr. Adkins learned of these SEC orders from his arbitration attorneys, likely in 2004.  Tr. 75, 326-27, 329-30 (C. Adkins).  He believed that one of the consequences of these orders was to reduce the three individuals' earning power, making the collection of any judgment against them more difficult.  Id. at 408.

By the end of 2004, neither Mr. Ingrassia, Mr. Volman, nor Mr. Otto Kozak had paid plaintiffs for their losses.  Jt. Stip. ¶ 47.  Nor had the United States District Court for the Eastern District of New York entered a restitution order.  Id.

In August 2005, another Donald & Co. principal, Marc Freeman, was charged by information with conspiracy to commit securities fraud, securities fraud, and money laundering conspiracy.  JX 4.  That same month, Mr. Freeman agreed to plead guilty to all three charges.  Id.  As part of his plea agreement, he agreed to forfeit $50,000 to the United States.  JX 20 at 452-57.  He satisfied the forfeiture money judgment prior to his June 2009 sentencing.  JX 4.  And, as part of his sentence, Mr. Freeman was directed to pay restitution in the amount of $4,243,858.  Id.

Criminal proceedings against the other Donald & Co. principals and brokers were ongoing.  For example, in August 2005, Mr. Otto Kozak agreed to plead guilty to the securities fraud conspiracy and securities fraud charges filed against him.  Jt. Stip. ¶ 72; JX 2; JX 54.  Pursuant to his plea agreement, he was subject to imprisonment, supervised release, fines that could exceed $1.25 million, and mandatory restitution in an amount to be determined.  JX 54.  Mr. Otto Kozak was sentenced in July 2006.  JX 2.  As part of his sentence, he was directed to pay restitution in the amount of $631,482.26.  Id.  Before he died in April 2011, Jt. Stip. ¶ 56, Mr. Otto Kozak made restitution payments totaling $255, JX 61.  Another criminal defendant, Mr. Volman, satisfied the $300,000 forfeiture money judgment entered against him in September 2005, and was sentenced in July 2012.  JX 2.  As part of his sentence, Mr. Volman was directed to pay restitution in the amount of $3,590,466.50.  Id.; JX 18.  Mr. Ingrassia was sentenced in December 2009, and was directed to pay restitution in the amount of $4,243,858.44.  JX 2; JX 18.  And, Mr. Stetson, sentenced in March 2011, was directed to pay restitution in the amount of $3,590,466.50.  JX 3.  That same year, Mr. Stetson made a $75,000 payment in partial satisfaction of the $150,000 forfeiture money judgment entered against him.  Id.  The restitution obligations of Mr. Volman, Mr. Ingrassia, Mr. Stetson, and Mr. Freeman were joint and several.  JX 17; JX 18; JX 19; JX 20.  As of January 28, 2014, they had paid a total of at least $7093.27 towards their obligations.[19]  JX 61.  Other defendants–Mr. Bassin, Mr. McFadden, Mr. Antonelli,

---

[18]  The SEC did not take action against the other defendants until May 2006.  That month, it barred Mr. Otto Kozak, Mr. Bassin, Mr. Cunzio, and Mr. McFadden from acting as brokers or dealers in securities, JX 92; DX 1; DX 2; DX 3; and instituted proceedings against Mr. Robert Kozak and Mr. Flanagan, JX 93.

[19]  The record lacks any evidence regarding restitution payments made by Mr. Freeman.

Mr. Cunzio, and Mr. Robert Kozak–had paid a total of $44,574.63 in restitution (out of a total combined obligation of $392,223.24).[20]  Id.; JX 2.

The United States Attorney's Office, having identified plaintiffs as victims of the securities fraud perpetuated at Donald & Co., Jt. Stip. ¶¶ 57, 93, kept plaintiffs apprised of the ongoing criminal proceedings, id. ¶ 73.  In an August 12, 2005 letter, the office's Victim Witness Coordinator advised plaintiffs of the charges filed against the Donald & Co. brokers, that they had "[t]he right to full and timely restitution as provided in law," and that they could follow the criminal proceedings through the Victim Notification System.  JX 41 at 657-58; accord Jt. Stip. ¶ 94.  Later, in a March 31, 2006 letter regarding sentencing proceedings, the United States Attorney's Office advised plaintiffs that they might be contacted by a probation officer to discuss how they were affected by the securities fraud, and requested that plaintiffs complete and return an enclosed "Affidavit of Loss" to the probation officer.  JX 41 at 662-64; see also id. at 663 (indicating that if plaintiffs had any questions regarding the attached affidavit, they could call the probation officer at the specified telephone number).  Plaintiffs received the March 31, 2006 letter, as reflected by the fact that they later submitted it–without the associated affidavit–to the Internal Revenue Service ("IRS").  JX 55; Tr. 109-10 (C. Adkins).   However, plaintiffs did not submit the affidavit to the probation officer; indeed, Mr. Adkins does not recall receiving the affidavit.  Tr. 215-16, 501-02 (C. Adkins).  Mr. Adkins does recall speaking with Special Agent Dengler regarding whether the government needed information from plaintiffs regarding their losses on the Elec and Classica stocks; according to Mr. Adkins, Special Agent Dengler responded that the government had a sufficient number of other victims and that it did not need plaintiffs' information.[21]  Id. at 287-88, 298-99, 301, 304, 510-11.  For that reason, and because (1) the indictment did not mention the MyTurn stock and (2) Mr. Adkins did not want what he thought would be the accompanying public exposure, plaintiffs decided against officially being identified as victims.  Id. at 288-90, 292, 305-06.  It appears that because there was no affidavit submitted on plaintiffs' behalf, plaintiffs were not included on the victim lists submitted to the federal district court for the purposes of receiving restitution from the convicted Donald & Co. brokers.  See, e.g., JX 17 at 297-361 (containing victim lists that included customers of Mr. Ingrassia, Mr. Freeman, Mr. Antonelli, Mr. Flanagan, Mr. Volman, Mr. Stetson, Mr. Robert Kozak, Mr. McFadden, and Mr. Cunzio, none of which included plaintiffs).  Those lists reflect that the identified victims claimed losses related to three stocks:  Classica, Elec, and "USHS."  Id.

While the criminal proceedings were pending, plaintiffs attempted to recoup some of their losses by claiming a federal income tax deduction.  JX 36; JX 37; JX 38; JX 39.  Pursuant to section 165 of the Internal Revenue Code ("IRC") and its implementing regulations, taxpayers

---

[20]  The record lacks any evidence regarding restitution payments made by the remaining defendant, Mr. Flanagan.  Mr. Flanagan was directed to pay $330,215.48 in restitution.  JX 2.

[21]  Mr. Adkins testified that he discussed this topic with Special Agent Dengler both before and after the indictments were issued.  Tr. 299, 301 (C. Adkins).

are permitted to deduct a theft loss from their income in the year that they sustained the loss. IRC § 165(a), (e) (2000); 26 C.F.R. §§ 1.165-1(a), (d), 1.165-8(a) (2001).  Accordingly, in 2006,[22] plaintiffs timely filed amended federal income tax returns for 2001 through 2004 reflecting a total theft loss of $2,118,725.  Jt. Stip. ¶¶ 63-66; JX 36; JX 37; JX 38; JX 39. Plaintiffs claimed the theft loss in 2004, carrying back portions of the loss to the previous three years.  JX 36; JX 37; JX 38; JX 39.  As a result, plaintiffs sought income tax refunds of $115,736 for 2004, JX 36; $24,021 for 2003, JX 37; $71,621 for 2002, JX 38; and $177,707 for 2001, JX 39.  Plaintiffs' tax returns were prepared by Alan A. Gavel of JK Harris 165 Services, LLC.[23]  JX 36; JX 37; JX 38; JX 39.

On April 29, 2008, approximately two years after they filed their amended federal income tax returns, plaintiffs withdrew their arbitration claim against Donald & Co. and its brokers.  Jt. Stip. ¶ 92.  The record contains no evidence that the United States Attorney requested that plaintiffs' arbitration proceeding be stayed pending resolution of the criminal proceedings against the Donald & Co. brokers.  See also Tr. 230 (C. Adkins) (reflecting Mr. Adkins's testimony that he did not know whether the United States Attorney stayed all civil proceedings against the criminal defendants).  Indeed, at least one arbitration claim against Donald & Co. and one of its brokers resulted in an award for the claimants while the criminal proceedings were pending.[24] See JX 49 (Auderer v. Donald & Co., filed on January 21, 2003, decision for claimants on March 16, 2005).

Subsequently, on December 12, 2008, the IRS disallowed plaintiffs' refund claims for 2001, 2003, and 2004 in the total amount of $317,458.[25]  Compl. ¶ 22; Answer ¶ 22.  Plaintiffs

---

[22]  The amended tax returns were signed by plaintiffs in March 2006 (the amended 2004 tax return) and May 2006 (the amended 2001, 2002, and 2003 tax returns).  JX 36; JX 37; JX 38; JX 39.  However, the official records maintained by the IRS reflect that the amended tax returns were filed in May 2006 (2004) and July 2006 (2001, 2002, and 2003).  JX 25; JX 26; JX 27; JX 28.

[23]  Plaintiffs had previously utilized the services of this company to prepare amended tax returns to claim a theft loss deduction related to the losses they sustained as a result of the actions of Mr. Teseo and Mr. Wang.  Tr. 535, 537, 539-40 (C. Adkins).  The IRS did not contest the theft loss deduction claimed on those amended returns.  Id. at 537.

[24]  Other arbitration claims against Donald & Co. and its brokers were resolved prior to the institution of criminal proceedings.  See JX 46 (Oleszek v. Donald & Co., filed on November 5, 2001, decision for claimants on February 28, 2003); JX 47 (Dobin v. Donald & Co., filed on December 18, 2001, decision for claimants on April 14, 2003); JX 48 (Sandburg v. Donald & Co., filed on May 14, 2002, decision for claimants on March 28, 2003).

[25]  Plaintiffs' refund claims for those three years actually totaled $317,464.  The origin of the $6 discrepancy in the amounts is unclear.

protested the disallowance at the IRS Office of Appeals. Jt. Stip. ¶ 58. In their appeal, plaintiffs claimed a total theft loss, as calculated by their accountant Charles A. Bish, of $2,575,958.19. Id. ¶ 60. Most of that loss derived from the Donald & Co. pump-and-dump scheme; $2,336,895.58 of the loss was attributable to stock purchases made through Donald & Co. and $194,062.61 of the loss was attributable to stock purchases made via the third-party brokers.[26] Id. ¶ 84; Tr. 122-23 (C. Adkins). The remaining $45,000 of the claimed loss related to plaintiffs' investment in the Vianet private placement offering. Jt. Stip. ¶ 84; Tr. 122-23 (C. Adkins).

In an April 5, 2011 "Appeals Case Memorandum," an IRS Appeals Officer, David Kaplon, concluded, pending the final computations of the Tax Computation Specialist, that plaintiffs had sustained a theft loss of $2,532,996.01–plaintiffs' claimed theft loss minus the portion of the loss attributable to the Great Train Store Co. and Tera Computer Co. stock purchases through third-party brokers–in 2004, and were therefore entitled to the corresponding refunds. Jt. Stip. ¶¶ 58-59; PX 10. Mr. Kaplon described his conclusion as a "proposed settlement . . . ." PX 10 at 6. However, the proposed settlement was never finalized. Tr. 465 (Kaplon). As reflected in Mr. Kaplon's memorandum and attached transmittal form, the IRS Office of Appeals lacked jurisdiction to settle plaintiffs' claim because plaintiffs had filed suit in the United States Court of Federal Claims. PX 10. Indeed, plaintiffs filed suit in this court on December 10, 2010, seeking a federal income tax refund in the total amount of $317,458.

Currently, there are no funds available from the convicted Donald & Co. brokers to pay restitution to plaintiffs. Jt. Stip. ¶ 48. In fact, none of the named victims of the Donald & Co. stock manipulation scheme has been fully reimbursed for their losses. Id. ¶ 49. Further, there is no evidence that the convicted Donald & Co. brokers–aside from Mr. Freeman–possess assets sufficient to pay restitution or any judgment against them.[27] Id. ¶ 68. And, plaintiffs do not have "insurance or other vehicle for recovery for [their] loss." Id. ¶ 74.

## II. PROCEDURAL HISTORY

As previously noted, plaintiffs filed their complaint on December 10, 2010, seeking a federal income tax refund in the total amount of $317,458. After the close of discovery, the parties each moved for summary judgment. Initially, the issues presented by the parties in those motions included whether plaintiffs' investment losses constituted a theft loss pursuant to IRC § 165; if so, whether 2004 was the correct year to allow the theft loss deduction; and, if plaintiffs sustained a theft loss in 2004, what was the proper amount of the tax deduction and associated

---

[26] The court derives the $194,062.61 figure by subtracting from plaintiffs' total claimed theft loss the $2,336,895.58 attributable to the Donald & Co. pump-and-dump scheme, Jt. Stip. ¶ 95, and the $45,000 attributable to the alleged theft related to the Vianet private placement offering, id.; Tr. 122-23 (C. Adkins).

[27] The parties' fact stipulation does not apply to Mr. Freeman, and the record contains no evidence regarding Mr. Freeman's assets.

refunds.  During supplemental briefing, defendant conceded that most of plaintiffs' investment losses–those attributable to stock purchases made through Donald & Co.–constituted a theft loss.  Thus, the issues remaining for the court's resolution were (1) whether the $239,062.61 in losses attributable to stock purchases through the third-party brokers and to the Vianet private placement offering constituted theft losses under IRC § 165; (2) whether 2004 was the correct year to allow the theft loss deduction; and (3) if a refund was proper, what was the amount of that refund.

In a December 11, 2013 Opinion and Order, the court first addressed the theft losses suffered by plaintiffs that were attributable to stock purchases through the third-party brokers.  Adkins v. United States, 113 Fed. Cl. 797, 804-06 (2013).  It held that any losses attributable to plaintiffs' purchases of Tera Computer Co. and Great Train Store Co. stock could not constitute theft losses under IRC § 165.  Id. at 805-06.  However, with respect to any losses attributable to plaintiffs' purchases of MyTurn stock through the third-party brokers, the court held that genuine issues of material fact precluded the entry of summary judgment.  Id. at 805.  Similarly, the court declined to enter summary judgment with respect to the alleged loss attributable to the Vianet private placement offering due to the existence of genuine issues of material fact.  Id. at 806.  And, genuine issues of material fact prevented the court from entering summary judgment as to whether plaintiffs properly claimed their theft loss in 2004.[28]  Id. at 806-09.

Trial was held in Washington, DC on the remaining issues from November 12 to 14, 2014.  During trial, the court heard testimony from both plaintiffs, Mr. Kaplon, Mr. Bish, and Special Agent Dengler, and received documentary evidence.  The parties submitted posttrial briefs, and the court deems further argument unnecessary.

## III.  DISCUSSION

### A.  Legal Standard

The court begins its analysis by determining whether 2004 was the proper year for plaintiffs to claim their theft loss deduction.  As a general matter, a theft loss is allowed as a deduction in the year in which it is sustained, IRC § 165(a), and taxpayers are considered to have sustained a theft loss in the year in which they discover it, id. § 165(e).  However, taxpayers cannot deduct a theft loss for which they have been compensated by insurance or otherwise.  Id. § 165(a).  More particularly:

> [I]f in the year of discovery there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no portion of the loss with respect to which reimbursement may be received is sustained . . . until the taxable

---

[28]  Because the proper year for the theft loss deduction remained in dispute, the court was not required to address the final issue:  the amount of the refund due plaintiffs.  See Adkins, 113 Fed. Cl. at 809.

year in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received.

26 C.F.R. § 1.165-1(d)(3), cited in id. § 1.165-8(a)(2); accord id. § 1.165-1(d)(2)(i).  Taxpayers bear the burden of establishing their entitlement to a theft loss deduction.  Boehm v. Comm'r, 326 U.S. 287, 294 (1945); accord Jeppsen v. Comm'r, 128 F.3d 1410, 1418 (10th Cir. 1997) (noting that the taxpayer had a "high" burden of proving "that it could have been ascertained with reasonable certainty as of [the end of the relevant tax year] that [his] loss would never be recovered"); Parmelee Transp. Co. v. United States, 351 F.2d 619, 628 (Ct. Cl. 1965) (indicating that the taxpayer had the burden of proving a reasonable prospect of recovering its loss in the year that the loss was discovered); Premji v. Comm'r, 72 T.C.M. (CCH) 16, 21 (1996) ("Petitioners have the burden of proving that . . . a deductible loss occurred in the year claimed"), aff'd, 139 F.3d 912 (10th Cir. 1998) (unpublished table decision).  However, if "a taxpayer introduces credible evidence with respect to any factual issue relevant to ascertaining the liability of the taxpayer," the government "shall have the burden of proof with respect to such issue."[29] IRC § 7491(a)(1).  Although "credible evidence" is not defined in the statute, the statute's legislative history contains the following definition, relied upon by several courts:[30]  "Credible evidence is the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted (without regard to the judicial presumption of IRS correctness)."  H.R. Rep. No. 105-599, at 240-41 (1998) (Conf. Rep.).

Under the applicable regulations, "there can be no deduction if there exists a reasonable prospect of recovery" in the year that the theft loss was discovered.  Parmelee Transp. Co., 351 F.2d at 627.  "Whether a reasonable prospect of recovery exists with respect to a claim for reimbursement of a loss is a question of fact to be determined upon an examination of all facts and circumstances."  26 C.F.R. § 1.165-1(d)(2)(i).  The court may consider both objective and subjective factors during its assessment, but must be mindful that a subjective factor, such as a taxpayer's "reasonable and honest belief," cannot be "the controlling or sole criterion."  Boehm, 326 U.S. at 292; see also id. at 293 ("The standard for determining the year for deduction of a loss is . . . a flexible, practical one, varying according to the circumstances of each case.").  Relevant objective factors include the existence of a claim or pending litigation, see Parmelee Transp. Co., 351 F.2d at 628 (remarking that a court must examine the "probability of recovery"

_____

[29]  The burden of proof shifts to the government only if the taxpayer establishes that he has met the requirements of IRC § 7491(a)(2).  In their posttrial briefs, plaintiffs do not address these requirements, and defendant does not contend that plaintiffs have not met the requirements.

[30]  See, e.g., Thompson v. United States, 523 F. Supp. 2d 1291, 1296-97 (N.D. Ala. 2007); Okerlund v. United States, 53 Fed. Cl. 341, 356 & n.23 (2002), aff'd, 365 F.3d 1044 (Fed. Cir. 2004); Davis v. Comm'r, 89 T.C.M. (CCH) 1518, 1522 (2005).  But see Heger v. United States, 103 Fed. Cl. 261, 266 n.4 (2012) ("The definition was not included in the statute itself, so the court considers it to be merely informative rather than authoritative.").

from the claim or litigation, with a "40 to 50 percent or better chance of recovery" being considered sufficient to constitute a reasonable prospect of recovery), and the availability of civil and criminal restitution, see Vincentini v. Comm'r, 96 T.C.M. (CCH) 400, 405 (2008) (holding that it was reasonable to anticipate that a federal district court might order "defendants, if convicted, to pay restitution to their victims . . . and to forfeit property that could be used to satisfy the restitution order"). The court's ultimate inquiry is to determine what a reasonable taxpayer would have concluded about his prospects of recovery in the year that he discovered the loss. Parmelee Transp. Co., 351 F.2d at 628; accord Jeppsen, 128 F.3d at 1416 ("[D]etermination of a reasonable prospect of recovery is a question of foresight."). If the "prospect of recovery was simply unknowable" in the year of discovery, a taxpayer is "not entitled to take the theft loss deduction" in that year. Jeppsen, 128 F.3d at 1418. However, a taxpayer need not establish "that there is no possibility of an eventual recoupment" to claim the deduction. United States v. S.S. White Dental Mfg. Co. of Pa., 274 U.S. 398, 402-03 (1927).

If a taxpayer has a reasonable prospect for recovery in the year that he discovers his loss, then he cannot claim the theft loss deduction until the year "in which it can be ascertained with reasonable certainty whether or not such reimbursement will be received." 26 C.F.R. § 1.165-1(d)(3); accord id. § 1.165-1(d)(2)(i). "Whether or not such reimbursement will be received may be ascertained with reasonable certainty, for example, by a settlement of the claim, by an adjudication of the claim, or by an abandonment of the claim." Id. § 1.165-1(d)(2)(i). And, when a taxpayer claims that the year he sustained his loss "is fixed by his abandonment of the claim for reimbursement, he must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release." Id.; see also Alioto v. Comm'r, 699 F.3d 948, 954 (6th Cir. 2012) (holding that a taxpayer's testimony regarding his "subjective understanding that he would not be paid back" did not "meet the requirement of 'objective evidence' to prove abandonment"); Montgomery Coca-Cola Bottling Co. v. United States, 615 F.2d 1318, 1327 (Ct. Cl. 1980) ("The subjective intent testimony of the [taxpayer] can only be seriously considered to the extent it is consistent with the objective evidence.").

## B. Plaintiffs Discovered the Theft Loss in 2002 and Had a Reasonable Prospect of Recovery in That Year

There is no dispute that plaintiffs discovered the theft loss in 2002.[31] And, neither plaintiffs nor defendant disputes that in 2002, there existed "a claim for reimbursement with respect to which there [was] a reasonable prospect of recovery . . . ." 26 C.F.R. § 1.165-1(d)(3). Plaintiffs filed their arbitration claim against Donald & Co., Mr. Stetson, Mr. Volman, and Mr. Ingrassia in February 2002, and by the end of that year, they had neither sought to adjourn the

---

[31] Indeed, although the parties did not stipulate to this fact prior to trial, they affirmatively state in their posttrial briefs that plaintiffs discovered the theft loss in 2002.

proceedings nor withdrawn their claim.[32]  Accordingly, in light of the ongoing arbitration proceedings, plaintiffs could not claim a theft loss deduction in 2002.  Instead, they were required to delay their deduction until the "year in which it [could] be ascertained with reasonable certainty whether or not" they would receive reimbursement of their losses from their arbitration claim.  Id.  Plaintiffs determined that the proper year to claim their theft loss was 2004, and filed amended federal income tax returns reflecting the deduction.  The IRS disallowed plaintiffs' refund claim, and takes the position in this litigation that 2004 was not the proper year for plaintiffs to claim their theft loss deduction.  Thus, the court's task is to determine whether plaintiffs could have, in 2004, ascertained with reasonable certainty that they would not receive reimbursement of their losses from their arbitration claim.

## C. Plaintiffs Have Not Established That They Sustained the Theft Loss in 2004

### 1. The Proper Analytical Framework

Before determining whether plaintiffs could have, in 2004, ascertained with reasonable certainty that they would not receive reimbursement of their losses from their arbitration claim, the court must address plaintiffs' contention that the "ascertain[] with reasonable certainty" analysis is not applicable in this case.  Specifically, plaintiffs assert that they are not claiming that the year they sustained their loss was fixed by their abandonment of the arbitration claim.  Rather, plaintiffs contend that they are "looking at the test in the first part of the regulation, that no reasonable prospect for recovery existed after 2004."  Pls.' Posttrial Br. 25.  Plaintiffs' interpretation of the applicable regulations lacks merit.

As described above, the relevant regulations describe a two-stage analysis.  First, a court must determine whether the taxpayer has a reasonable prospect of recovery on a claim for reimbursement in the year that he discovered the loss.  If the taxpayer does not have a reasonable prospect of recovery, then the year of discovery is the year that he sustained the loss.  26 C.F.R.

---

[32]  Defendant suggests that plaintiffs had additional viable claims for reimbursement in 2002 against Mr. Otto Kozak, Mr. Robert Kozak, Mr. Freeman, and Odyssey Capital LLC, as well as against Donald & Co.'s owners, THCG, Inc., Star Cross, Inc., and Mr. Blum.  However, because the court concludes below that plaintiffs failed to establish that they ascertained with reasonable certainty in 2004 that they could not recover on the arbitration claim that they did file, it need not decide whether plaintiffs had ascertained with reasonable certainty in 2004 that they could not recover on any claims that they did not file.

Aside from the claims suggested by defendant, the record lacks any evidence that plaintiffs had any other viable claim for reimbursement in 2002.  Of particular note, although plaintiffs became aware of the criminal investigation and criminal proceedings in 2003, the record contains no indication that they knew, or should have known, by the end of 2002 that Donald & Co. principals and employees would face criminal charges that might result in a separate claim for reimbursement (i.e., restitution).

§ 1.165-1(d)(3).  If, however, the taxpayer has a reasonable prospect of recovery in the year that he discovers the loss, then the court advances to the second step:  determining whether, in the year the loss was claimed, the taxpayer was able to ascertain with reasonable certainty whether he would receive reimbursement from his claim.  Id.  In short, the "reasonable prospect of recovery" and "ascertain[] with reasonable certainty" inquiries are distinct.[33]

The distinctiveness of the two inquiries was specifically addressed in Johnson v. United States, 74 Fed. Cl. 360, 365 (2006).  In that case, the taxpayers discovered in 1997 that they had been the victims of fraud, losing approximately $78 million.  Id. at 361.  The taxpayers filed suit against the perpetrator of the fraud in Florida state court in 1998.  Id.  That same year, they became involved in other litigation to recover their loss.  Id.  The taxpayers claimed that by the end of 1998, they only had a reasonable prospect of recovering approximately $20 million of their loss, and were reasonably certain that they would not recover the remainder.  Id. at 361-62.  They therefore claimed a theft loss deduction of approximately $58 million on their amended 1998 federal income tax return.  Id. at 361.

Prior to determining whether the taxpayers were entitled to claim their theft loss deduction in 1998, the court addressed the parties' competing interpretation of the applicable regulations.  Id. at 364-66.  It commented that in several of the decisions relied upon by the taxpayers, the courts "tended to combine the 'reasonable prospect of recovery' inquiry and the 'ascertain with reasonable certainty' inquiry," even though those "two inquiries are distinct and the standards to be applied are different."  Id. at 365; see also Johnson v. United States, 80 Fed. Cl. 96, 117 (2008) ("[T]he 'reasonable prospect of discovery' standard is only applicable in the year a taxpayer discovers a theft loss."), appeal dismissed, 453 F. App'x 959 (Fed. Cir. 2010).  It

---

[33]  The court did not find it necessary to address the distinction in its December 11, 2013 Opinion and Order when it declined to enter summary judgment for either party on the issue of whether 2004 was the proper year for plaintiffs to deduct their theft loss because of the existence of genuine issues of material fact.  However, in a posttrial order, dated November 18, 2014, the court specifically requested that the parties address, in their posttrial briefs, "whether plaintiffs, in 2004, could have ascertained with reasonable certainty that they would not receive reimbursement on their arbitration claim."  Both parties addressed this issue.  See, e.g., Pls.' Posttrial Br. 22-27; Def.'s Posttrial Br. 24-26; Pls.' Posttrial Resp. Br. 8-9.  Thus, the court applies the two-stage analysis prescribed by the pertinent regulations in ruling on plaintiffs' tax refund claim.  See Textainer Equip. Mgmt. Ltd. v. United States, 105 Fed. Cl. 69, 72 (2012) (concluding that when a court does not decide an issue in denying a motion for summary judgment, the party who bears the burden of proof is not relieved of that burden); McGowan v. Sec'y of HHS, 31 Fed. Cl. 734, 737 (1994) ("The law of the case doctrine does not affect the power of a court to reconsider its interlocutory decisions.  The court may change any interlocutory decision up until the entry of final [judgment]."); cf. Aycock Eng'g, Inc. v. Airflite, Inc., 560 F.3d 1350, 1356 (Fed. Cir. 2009) (citing Bethlehem Steel Exp. Corp. v. Redondo Constr. Corp., 140 F.3d 319, 321 (1st Cir. 1998)) (indicating that a denial of summary judgment does not establish law of the case).

further noted that those decisions could be distinguished on their facts.  See 74 Fed. Cl. at 365 ("[T]he cases cited by the plaintiffs involve theft loss deductions taken in the year that the theft was discovered, and turn on whether the taxpayer properly determined that there was a 'reasonable prospect for recovery.' . . . This case, in contrast, turns on whether, after having elected to pursue a claim for reimbursement for which there was a reasonable prospect of recovery [in 1997], the plaintiffs 'ascertained with reasonable certainty' in 1998 whether or not reimbursement would be received."  (footnote omitted)).  Indeed, the court explained:

> To date, the decisions that have contemplated the proper interpretation of IRC § 165(e) with regard to the appropriate timing of a theft loss deduction have considered two different scenarios.  First, courts have evaluated whether a taxpayer who took a theft loss deduction in the year of discovery, and whose deduction in that year was challenged by the IRS, had a reasonable prospect of recovering all or a portion of the loss in the year of discovery.  Alternately, courts have considered whether a taxpayer whose decision to wait to take a theft loss deduction until recovery efforts were complete was challenged by the IRS was appropriate in postponing the theft loss deduction when the taxpayer did not have any real prospect of recovering the loss.

> No court has considered whether a taxpayer was appropriate in postponing a theft loss deduction until after the year of discovery (in which the taxpayer had a reasonable prospect of recovery), but when recovery efforts were not yet completed or abandoned, which is at issue here.

Id. at 365 n.5 (citations omitted).  Accordingly, when analyzing the taxpayers' contentions, the court followed the plain language of the regulation:  It first found that the taxpayers had a reasonable prospect of recovering their loss in 1997, the year of discovery.  Id. at 363-64.  It then concluded that the taxpayers could not have ascertained with reasonable certainty in 1998 that they would not have recovered approximately $58 million of their loss because the $58 million figure was an estimate made by their attorneys and accountants before any of their pending claims had been fully resolved.  Id. at 364-66.

Plaintiffs characterize the decision in Johnson as "outside of the mainstream," but only cite one decision–an unpublished order–in which a court analyzed whether a reasonable prospect of recovery existed after the year in which the theft loss discovered.  Pls.' Posttrial Br. 25 (citing Wisnewski v. United States, No. CA3-78-0513-F, 1979 WL 1415 (N.D. Tex. May 21, 1979)).  In that case, the taxpayers discovered the loss in 1968 and filed suit to recover the loss that same year.  Wisnewski, 1979 WL 1415, at *1.  A consent judgment in that suit was entered in 1972.  Id.  On their 1972 federal income tax return the taxpayers claimed a casualty or theft loss.  Id.  The court concluded that "1971 was the last possible year in which the Plaintiffs had a reasonable expectation of recovery."  Id.; accord id. at *2 ("Plaintiffs did not have a reasonable possibility of recovering their alleged losses of 1968 in 1972, and 1971 was the last year in which a reasonable possibility of recovery existed . . . .").

Plaintiffs' reliance on Wisnewski is misplaced.  As an initial matter, this court is not bound by the holdings of federal district courts.  See AINS, Inc. v. United States, 365 F.3d 1333, 1336 n.1 (Fed. Cir. 2004) (noting that the holdings of federal district courts "are instructive but not precedential").  Moreover, the analysis in Wisnewski is contrary to the plain language of the applicable regulations.  Therefore, the court declines to follow the reasoning in Wisnewski. Rather, it concludes that the plain language of the relevant regulations requires, as set forth in Johnson, a two-stage analysis when a taxpayer claims a deduction after the year in which he discovers his loss.  Thus, in this case, the court must, as noted above, determine whether plaintiffs could have, in 2004, ascertained with reasonable certainty that they would not receive reimbursement of their losses from their arbitration claim.

**2.  Plaintiffs Could Not Have Ascertained With Reasonable Certainty Whether They Would Receive Reimbursement for Their Losses in 2004**

There are at least three ways in which a taxpayer can ascertain with reasonable certainty whether he will receive reimbursement for his loss from a claim:  settling the claim, adjudicating the claim, and abandoning the claim.  26 C.F.R. § 1.165-1(d)(2)(i).  Because these methods are expressly designated as "example[s]" in the applicable regulation, id., a taxpayer is not precluded from ascertaining the viability of his claim in another manner, see Johnson, 74 Fed. Cl. at 365-66 (holding that a taxpayer is required to demonstrate the resolution of the claim with an "objectively verifiable amount" of recovery).  If, however, a taxpayer relies on the abandonment of his claim to establish the year that he can deduct the loss, he must produce "objective evidence" of abandonment.  26 C.F.R. § 1.165-1(d)(2)(i).

As noted above, plaintiffs assert that they are not relying on the abandonment of their arbitration claim to fix the proper year for their theft loss deduction.  However, under the relevant regulations, the disposition of plaintiffs' arbitration claim is key to determining when plaintiffs can claim a theft loss deduction.  In 2002, the year in which plaintiffs discovered their loss, plaintiffs had at least one claim for reimbursement for which there was a reasonable prospect of recovery–their arbitration claim.  Therefore, plaintiffs were not entitled to claim a theft loss deduction until they could ascertain with reasonable certainty whether they would recover on their arbitration claim.  Consequently, the court examines the events related to plaintiffs' pursuit of that claim.

Plaintiffs filed their arbitration claim against Donald & Co., Mr. Stetson, Mr. Volman, and Mr. Ingrassia in 2002.  That year, they made two payments to their arbitration attorneys.  In addition, plaintiffs learned that Donald & Co. had ceased operations.

In 2003, Donald & Co. was expelled from the NASD.  That same year, plaintiffs' arbitration attorneys unsuccessfully attempted to compel document production from Donald & Co. and the individual respondents.  Ultimately, one of the attorneys sent a letter to the NASD requesting that the hearing scheduled for April 1, 2003, be adjourned for two groups of related reasons:  (1) Donald & Co. had not fully responded to plaintiffs' discovery requests, plaintiffs'

attorneys had not been successful in securing the necessary documents elsewhere, and plaintiffs' attorneys would need more time for discovery; and (2) plaintiffs learned of the existence of a criminal investigation of Donald & Co. and associated individuals, plaintiffs' attorneys were advised by the United States Attorney that an indictment would soon be issued, and plaintiffs' attorneys were further advised that the United States Attorney would request that all civil litigation, including arbitration proceedings, be stayed pending the resolution of the criminal proceedings. The arbitration attorneys suggested to plaintiffs that they allow the arbitration claim to remain open in the event that the criminal proceedings revealed useful information. Plaintiffs did not object to this suggestion; the arbitration proceedings remained open, but inactive. However, Mr. Adkins did not believe that plaintiffs would get any money from their arbitration claim. Indeed, plaintiffs did not make any further payments to their arbitration attorneys in 2003 or beyond.

The arbitration proceedings remained open but inactive in 2004; plaintiffs' arbitration attorneys took no action except to respond to NASD inquiries with requests for further postponements. In May 2004, Mr. Volman and Mr. Ingrassia were indicted; both were charged with securities fraud related to the Elec and Classica stocks. In September 2004, Mr. Stetson was charged by information with, among other things, securities fraud related to the Classica stock. The indictment and the information both contained criminal forfeiture allegations. Mr. Adkins saw the indictment, and became aware of the charges against Mr. Stetson, in 2004. He was advised by his arbitration attorneys that the arbitration proceedings were "trumped" by the indictment. Mr. Adkins further believed that as part of the criminal proceedings, the government would seize all of the criminal defendants' assets, as well as any documentation regarding their assets, foreclosing plaintiffs' ability to collect an arbitration award. There is no evidence, however, that plaintiffs or their arbitration attorneys attempted to ascertain the indicted individuals' assets in 2004.

Also in 2004, the SEC barred Mr. Stetson, Mr. Ingrassia, and Mr. Volman from acting as brokers or dealers in securities. Mr. Adkins likely became aware of the SEC orders in 2004, and understood that the three individuals would, as a result of being barred from their regular occupation, have less income that could be used to satisfy any judgments against them.

Plaintiffs' arbitration proceedings remained open but inactive from 2005 through 2007 at the request of plaintiffs' arbitration attorneys; plaintiffs' attorneys took no action except to respond to NASD inquiries with requests for further postponements. There is no evidence that the United States Attorney requested that the arbitration proceedings be stayed pending the resolution of the criminal proceedings. Plaintiffs did not formally withdraw their arbitration claim until 2008.

Although plaintiffs do not say so explicitly, the court–based on the facts adduced at trial, plaintiffs' arguments, and the relevant regulations–infers that it is plaintiffs' position that in 2004, they ascertained with reasonable certainty that they would not recover anything on their arbitration claim. The facts further reflect that plaintiffs did not arrive at this conclusion because

-22-

they settled or litigated the claim, but instead came to believe that the claim was no longer viable because they would not be able to collect on it, and therefore stopped actively pursuing it.  In other words, notwithstanding their protestations otherwise, plaintiffs must be contending that they abandoned their arbitration claim.  See The American Heritage College Dictionary 1 (4th ed. 2004) (defining "abandon" as (1) "[t]o surrender one's claim to, right to, or interest in; give up entirely" and (2) "[t]o cease trying to continue; desist from").

There can be no dispute that a taxpayer who relies on the abandonment of a claim to fix the year that a theft loss was sustained "must be able to produce objective evidence of his having abandoned the claim, such as the execution of a release." 26 C.F.R. § 1.165-1(d)(2)(i). Subjective evidence alone is insufficient.  Alioto, 699 F.3d at 954.  Here, the only objective evidence offered by plaintiffs is that their arbitration attorneys requested in 2003 that the arbitration hearing be adjourned, that their arbitration attorneys responded to regular NASD inquiries with requests to keep the arbitration proceedings open but inactive, and that the proceedings remained open, but inactive, until 2008, when they formally withdrew their claim. In other words, although plaintiffs may have believed that recovery on their arbitration claim was unattainable in 2004 due to the institution of criminal proceedings, the likely guilty pleas, and the issuance of the orders by the SEC barring Mr. Stetson, Mr. Ingrassia, and Mr. Volman from acting as brokers or dealers in securities and therefore earning a living, they have supplied no objective evidence that they abandoned their claim in 2004.[34]  Plaintiffs did not produce evidence reflecting that they formally withdrew or renounced their claim in 2004.  Nor did they produce evidence establishing that the government actually seized all of the assets possessed by Mr. Stetson, Mr. Ingrassia, and Mr. Volman in 2004;[35] indeed, they did not produce evidence demonstrating that either they or their arbitration attorneys attempted, in 2004, to ascertain with reasonable certainty whether Mr. Stetson, Mr. Ingrassia, or Mr. Volman possessed assets that could be used to satisfy an arbitration award.[36]  Rather, the objective evidence in the record

---

[34]  Much of what plaintiffs deem to be objective evidence, see Pls.' Posttrial Resp. Br. 12-19, is actually subjective evidence.

[35]  All that plaintiffs could have objectively known in 2004 with respect to the government's intentions regarding the criminal defendants' assets was that the government intended to seek, upon the defendants' convictions, the forfeiture of property constituting or derived from the criminal activity or the forfeiture of substitute property.  Because the plea agreements of Mr. Stetson, Mr. Ingrassia, and Mr. Volman were filed under seal and were not unsealed until August 2005, plaintiffs could not have known in 2004 whether such forfeitures would actually occur and the amounts, if any, that would be forfeited.

[36]  That there is no evidence that Mr. Stetson, Mr. Ingrassia, or Mr. Volman possesses assets sufficient to pay a judgment against them–a fact stipulated by the parties–does not mean that plaintiffs had knowledge of this fact in 2004.  Further, plaintiffs were, or should have been, aware in 2004 that Mr. Stetson, Mr. Ingrassia, and Mr. Volman, as Donald & Co. principals, made money from the pump-and-dump scheme, that Donald & Co. had funds at Odyssey Capital

supports two other abandonment dates:  (1) 2003, when plaintiffs' arbitration attorneys requested that the NASD adjourn the scheduled hearing and when plaintiffs stopped paying their arbitration attorneys,[37] or (2) 2008, when plaintiffs formally withdrew their arbitration claim.  Accordingly, plaintiffs have not met their burden of establishing that they sustained their theft loss in 2004.[38]

## IV.  CONCLUSION

Unquestionably, plaintiffs are the victims of a theft and have not subsequently recovered their loss.  What remains in dispute is whether plaintiffs claimed the theft loss deduction in the

--------

LLC and Chase Manhattan Bank, and that Mr. Ingrassia owned a boat and real estate.  And, plaintiffs' arbitration attorneys' inaction on the arbitration claim does not establish that the attorneys searched for, but could not locate, any assets owned by Mr. Stetson, Mr. Ingrassia, or Mr. Volman.  Although the attorneys' inaction may reflect that they believed the three individuals lacked any assets, it does not reflect that the basis for that belief was the result of an asset search.

[37]  Moreover, Mr. Adkins testified that by the end of 2003, he did not believe that plaintiffs would recover any of their losses from their arbitration claim.  This subjective evidence reinforces the objective evidence supporting a 2003 abandonment date.  See Patterson v. United States, 459 F.2d 487, 493 (Ct. Cl. 1972) (noting that subjective testimony "should not be ignored when consistent with other objective facts").  And, notably, plaintiffs assert in their opening posttrial brief that they "did not dismiss their arbitration until 2008, but had abandoned it by 2003."  Pls.' Posttrial Br. 21; accord Pls.' Posttrial Resp. Br. 6 ("Plaintiffs abandoned their arbitration in 2003 against the Brokers with no recoverable assets . . . ."), 14 ("Plaintiffs abandoned their arbitration in 2003 . . . .").  In fact, plaintiffs assert that they would "not object if the Court finds that they are entitled to recognize the theft loss in tax year 2003."  The court declines plaintiffs' invitation.  The only issue before the court regarding the timing of plaintiffs' theft loss deduction is whether 2004 is the proper year for plaintiffs to claim it.  There is no evidence in the record that plaintiffs filed a claim for an income tax refund with the IRS based on a contention that they sustained a theft loss in 2003–the prerequisite for pursuing such a claim in this court.

[38]  Because plaintiffs have not demonstrated that they sustained their theft loss in 2004, the court need not resolve whether plaintiffs could recover their losses resulting from their purchase of MyTurn stock through the third-party brokers or their alleged $45,000 loss related to the Vianet private placement offering.  These claimed losses were part of plaintiffs' 2004 theft loss deduction.  Moreover, even if the alleged loss related to the Vianet private placement offering should be treated separately because it was not mentioned in plaintiffs' arbitration claim, plaintiffs presented no evidence regarding whether they had a reasonable prospect of recovering on a claim for reimbursement of the alleged loss in the year that they discovered the loss and, if so, when they could ascertain with reasonable certainty whether they would be able to recover on that claim.

proper year, in other words, the year that they sustained the loss.  Plaintiffs claim that they sustained the loss in 2004 because by the end of that year, they had no reasonable prospect of recovering on their arbitration claim.  However, under the factual circumstances presented in this case, the test is not whether plaintiffs had a reasonable prospect of recovering on their arbitration claim in 2004, but is instead whether, in 2004, plaintiffs could have ascertained with reasonable certainty that they would not recover on their arbitration claim.  To satisfy their burden under the latter test, plaintiffs were required to produce objective evidence that they abandoned their arbitration claim in 2004.  They failed to do so.  In the absence of such evidence, plaintiffs are not entitled to a theft loss deduction for the 2004 tax year.  Accordingly, the court **DISMISSES** plaintiffs' complaint **WITH PREJUDICE**.  No costs.  The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge