# In the United States Court of Federal Claims

No. 10-851T
(Filed: June 29, 2021)

```
*************************************
```
CHARLES P. ADKINS and JANE E.     *
ADKINS,     *
    *
         Plaintiffs,     *
    *
v.     *
    *
THE UNITED STATES,     *
    *
         Defendant.     *

RCFC 11 Sanctions; Attorney's Fees Under 26 U.S.C. § 7430; Substantial Justification; Appropriate Hourly Rates and Time Expended; Adequacy of Supporting Documentation

```
*************************************
```

John F. Rodgers, Alexandria, VA, for plaintiffs.

Steven E. Chasin, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Senior Judge

      Plaintiffs Charles P. and Jane E. Adkins were victims of a fraudulent investment scheme, and after extensive proceedings before this court and on appeal, obtained a refund of federal income taxes based on the losses they sustained due to the scheme. Plaintiffs now seek sanctions against the government in the form of attorney's fees or, in the alternative, an award of attorney's fees pursuant to the fee-shifting statute applicable to tax refund suits. As explained below, sanctions are not warranted in this case, but plaintiffs are entitled to statutory attorney's fees. The court therefore grants plaintiffs' motion in part.

## I. BACKGROUND

      Plaintiffs began investing through Donald & Co. Securities, Inc. ("Donald & Co.") in 1999.[1] Unbeknownst to plaintiffs, Donald & Co. was operating a "pump-and-dump" scheme. Plaintiffs suffered significant losses from this scheme.

---

[1] This section includes only the facts necessary for resolution of the pending motion. A fuller recitation of the facts can be found in the court's most recent merits decision. See Adkins v. United States, 140 Fed. Cl. 297 (2018), rev'd, 960 F.3d 1352 (Fed. Cir. 2020).

Because attempts to recover their losses from the perpetrators of the fraud were unsuccessful, plaintiffs sought to recoup some of those losses by claiming a federal income tax deduction. Pursuant to section 165 of the Internal Revenue Code ("I.R.C.") and its implementing regulations, taxpayers are permitted to deduct a theft loss from their income in the year that they sustained the loss. Plaintiffs chose to claim the theft loss in 2004, and then carry back portions of the loss to the previous three years. They filed amended federal income tax returns reflecting a total theft loss of $2,118,725, and seeking refunds of $115,736 for 2004, $24,021 for 2003, $71,621 for 2002, and $177,707 for 2001.

On December 12, 2008, the Internal Revenue Service ("IRS") disallowed plaintiffs' refund claims for 2001, 2003, and 2004. Plaintiffs protested the disallowance at the IRS Office of Appeals. In their appeal, plaintiffs claimed a total theft loss of $2,575,958.19. Most of that loss derived from the Donald & Co. pump-and-dump scheme: $2,336,895.58 of the loss was attributable to stock purchases made through Donald & Co. and $194,062.61 of the loss was attributable to stock purchases made through third-party brokers. The remaining $45,000 of the claimed loss related to plaintiffs' investment in a private placement offering.

In an April 5, 2011 "Appeals Case Memorandum," an IRS Appeals Officer, David Kaplon, concluded, pending the final computations of the Tax Computation Specialist, that plaintiffs had sustained a theft loss of $2,532,996.01—plaintiffs' claimed theft loss minus the portion of the loss attributable to certain stock purchases made through third-party brokers—in 2004, and were therefore entitled to the corresponding refunds. Mr. Kaplon described his conclusion as a proposed settlement. However, the proposed settlement was never finalized because the IRS Office of Appeals lost jurisdiction to settle plaintiffs' claim when plaintiffs filed their tax refund suit in this court on December 10, 2010.

After plaintiffs filed suit, the parties engaged in discovery and then cross-moved for summary judgment. Initially, the issues presented by the parties in those motions included whether plaintiffs' investment losses constituted a theft loss pursuant to I.R.C. § 165. Under the then-existing precedent, whether securities fraud constituted a theft was a matter of state law, and although the parties agreed that Virginia law was applicable, they disagreed on the interpretation of that law. However, while the motions were pending, the Honorable Francis M. Allegra issued a decision in Goeller v. United States, 109 Fed. Cl. 534 (2013), in which he determined that the definition of "theft" should be derived from federal common law. This court therefore requested supplemental briefing on the issue, and during that briefing, defendant conceded that most of plaintiffs' investment losses—those attributable to stock purchases made through Donald & Co.—constituted a theft loss. Thus, the issues remaining for the court's resolution were (1) whether the losses attributable to stock purchases through third-party brokers and to a private placement offering constituted theft losses under I.R.C. § 165; (2) whether 2004 was the correct year for the theft loss deduction; and (3) if a refund was proper, the amount of that refund.

In a December 11, 2013 Opinion and Order, the court held that (1) summary judgment for defendant was proper with respect to losses attributable to certain stock purchases through the third-party brokers; (2) summary judgment was not proper for either party with respect to losses attributable to other stock purchases through the third-party brokers or to the private placement offering; and (3) summary judgment was not proper for either party with respect to whether 2004

was the correct year for the theft loss deduction.  See generally Adkins v. United States, 113 Fed. Cl. 797, 804-06 (2013).

The court held a three-day trial on the outstanding issues in November 2014.  During trial, the court received documentary evidence and heard testimony from, among others, plaintiffs and Mr. Kaplon.  After the parties submitted posttrial briefs, the court concluded, in a February 16, 2016 Opinion and Order, that plaintiffs were not entitled to a theft loss deduction for the 2004 tax year and dismissed their complaint.  See generally Adkins v. United States, 125 Fed. Cl. 304 (2016), vacated, 856 F.3d 914 (Fed. Cir. 2017).  Plaintiffs appealed the court's decision to the United States Court of Appeals for the Federal Circuit ("Federal Circuit").  Concluding that this court misconstrued the regulation concerning the timing of a theft loss deduction, the Federal Circuit vacated this court's judgment and remanded the case for further proceedings.  See generally Adkins, 856 F.3d at 915-20.

On remand, the parties filed a joint status report indicating that "no further testimony or evidence" was required, and proposing a schedule for supplemental briefing.  After reviewing the supplemental briefs, the court encouraged the parties to engage in settlement discussions and, on the agreement of the parties, referred the case to the court's Alternative Dispute Resolution program.  On April 4, 2018, the parties advised the court that they were unable to reach a settlement.  The court thus provided the parties with a final opportunity to submit briefs in support of their positions.  After that briefing concluded, the court again held, in an October 26, 2018 Opinion and Order, that plaintiffs were not entitled to a theft loss deduction for the 2004 tax year.  See generally Adkins, 140 Fed. Cl. at 297.  Plaintiffs appealed that decision.  Ultimately, the Federal Circuit concluded that plaintiffs were, in fact, entitled to a theft loss deduction for the 2004 tax year.  See generally Adkins, 960 F.3d at 1353-68.  It therefore reversed this court's judgment and remanded the case for a calculation of the tax refund to which plaintiffs were entitled.  Id. at 1368.

On this second remand, the parties filed a stipulation reflecting their agreement regarding the amount of the judgment that should be entered for plaintiffs:  tax refunds of $115,730 for 2004, $24,021 for 2003, $71,621 for 2002, and $177,707 for 2001, and statutory interest on those amounts computed under chapter 67 of the I.R.C.  The court directed that judgment be entered in accordance with the stipulation.

Subsequent to the entry of judgment, plaintiffs filed a motion to amend the judgment to include specified amounts of prejudgment interest.  After the motion was fully briefed, the court concluded that plaintiffs had not demonstrated that their requested relief was warranted procedurally or substantively.  Ultimately, plaintiffs filed a satisfaction of judgment reflecting that they received the tax refunds and interest to which they were entitled.

Plaintiffs also filed a bill of costs, seeking to recover $8595.34 for fees paid to the clerk, court reporter fees, fees incident to the taking of depositions, witness fees and costs, and costs taxed by the Federal Circuit.  Defendant filed an objection, which was followed by a reply and a surreply.  Upon reviewing the parties' submissions, the clerk taxed costs in plaintiffs' favor in the amount of $1414.00.

Shortly after filing their motion to amend the judgment and bill of costs, plaintiffs filed the motion now pending before the court: a motion for sanctions under Rule 11 of the Rules of the United States Court of Federal Claims ("RCFC") or, in the alternative, for attorney's fees under I.R.C. § 7430. Defendant opposes the motion. The motion is now fully briefed and, with neither party requesting oral argument, ripe for adjudication.

## II. DISCUSSION

As they emphasize in their reply, the primary remedy plaintiffs seek is sanctions against defendant pursuant to RCFC 11. However, if the court does not award sanctions, plaintiffs request the alternative remedy of attorney's fees under I.R.C. § 7430. The court turns first to plaintiffs' request for sanctions.

### A. Request for Sanctions Under RCFC 11

Plaintiffs argue that RCFC 11 sanctions are appropriate because defendant allegedly abandoned the settlement they reached with Mr. Kaplon of the IRS Office of Appeals by actively litigating the case, including purportedly resolved issues, after they filed suit. Defendant, in response, contends that the motion is procedurally defective, but even if it were not, it is frivolous on the merits.

### 1. Legal Standard

Attorneys are obligated to ensure that their filings are not being presented to the court for an improper purpose, and that the representations in those filings are factually and legally sound. These obligations are enshrined in RCFC 11, which provides:

By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

RCFC 11(b). RCFC 11 "is aimed at curbing baseless filings, which abuse the judicial system and burden courts and parties with needless expense and delay." Judin v. United States, 110 F.3d 780, 784 (Fed. Cir. 1997) (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 397-98 (1990)). Thus, to avoid running afoul of RCFC 11, attorneys must engage in a factual and legal inquiry, reasonable under the circumstances, prior to presenting filings to the court. RCFC 11(b); accord Fed. R. Civ. P. 11 advisory committee's note, 1993 Amendments ("FRCP 11 note") ("The rule continues to require litigants to 'stop-and-think' before initially making legal or factual contentions."); see also Chambers v. NASCO, Inc., 501 U.S. 32, 47 (1991) (noting that Rule 11 "imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith").

If a party believes that an opponent violated RCFC 11(b) and should be sanctioned as a result, it may prepare a motion "describ[ing] the specific conduct that allegedly violates RCFC 11(b)" and serve that motion on its opponent. RCFC 11(c)(2). The motion must be separate from any other motion. Id. After twenty-one days, the party may file the motion with the court, but only if its opponent has not "withdrawn or appropriately corrected" the alleged violation. Id. The service requirement of this safe harbor provision is strictly construed. Coastal Envtl. Grp., Inc. v. United States, 118 Fed. Cl. 15, 29 (2014); accord Penn, LLC v. Prosper Bus. Dev. Corp., 773 F.3d 764, 768 (6th Cir. 2014) (observing that the United States Courts of Appeals for the Second, Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Circuits all require strict compliance with the service requirement). Moreover, an RCFC 11 motion "should be served promptly after the inappropriate paper is filed" or once "the other party has had a reasonable opportunity for discovery," and "if delayed too long, may be viewed as untimely." FRCP 11 note; see also id. ("Given the 'safe harbor' provisions . . . , a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention).").

Parties who are alleged to have violated RCFC 11(b) must be provided with notice of the possible violation and an opportunity to be heard before sanctions are imposed. RCFC 11(c)(1). If, after such notice and opportunity to respond, the court determines that a party has violated RCFC 11(b), it may "impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." RCFC 11(c)(1); accord FRCP 11 note ("The sanction should be imposed on the persons . . . who have violated the rule or may be determined to be responsible for the violation."). Any sanction imposed by the court "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." RCFC 11(c)(4); accord FRCP 11 note ("[T]he sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons."). Sanctions "may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." RCFC 11(c)(4). In determining an appropriate sanction, the court may consider, among other things:

> [w]hether the improper conduct was willful, or negligent; whether it was part of a
> pattern of activity, or an isolated event; . . . whether the person has engaged in
> similar conduct in other litigation; whether it was intended to injure; what effect it

had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; [and] what amount is needed to deter similar activity by other litigants[.]

FRCP 11 note. At bottom, the purpose of sanctions under RCFC 11 is "to deter" improper conduct, not "to compensate" for such conduct if it occurs. Id.

## 2. RCFC 11 Sanctions Are Not Appropriate

At the outset, defendant argues that plaintiffs' motion for sanctions is procedurally defective, and must be denied on that basis. The first defect defendant identifies is plaintiffs' failure to comply with the mandatory safe harbor rule. It observes:

> Here, not only did plaintiffs fail to adhere to the 21-day-service-before filing mandate, they waited nearly 10 years after the supposed violation by our first attorney of record [who filed the answer and briefed defendant's motion for summary judgment] and roughly six years after the supposed violation by our second attorney of record [who tried the case] to simultaneously serve the motion on the United States (for the first time) and file the motion with the Court, on September 29, 2020. Thus, even if plaintiffs had complied with the safe harbor mandate, there would be no way for the alleged violation(s) to have been "withdrawn or appropriately corrected."

Def.'s Resp. 7 (quoting RCFC 11(c)(2)). Defendant further contends that the motion is defective because plaintiffs combined it with a request for attorney's fees under I.R.C. § 7430 in violation of RCFC 11(c)(2). Plaintiffs respond that they could not have brought their motion any earlier than at the conclusion of the suit because they had been attempting, unsuccessfully, to counter defendant's arguments on the merits of their claim throughout the litigation. They further argue that they did not combine another motion with their motion for sanctions, but instead requested an alternative remedy if their request for sanctions was denied.

The court agrees with defendant that plaintiffs' motion for sanctions is procedurally improper and must be denied on that basis. A party moving for sanctions under RCFC 11(c)(2) must present its motion to the purportedly offending party before filing it to allow that party to take any necessary curative action. As this court observed in Coastal Environmental Group, this requirement is strictly construed. 118 Fed. Cl. at 29. Here, however, plaintiffs did not serve their motion on defendant before filing it. Their failure to do so is counter to the remedial and deterrent purposes of RCFC 11 and associated sanctions.

Moreover, as explained by the Advisory Committee on Civil Rules, a motion for sanctions should be served as soon as possible after the offending document is filed. However, in direct contravention of the Advisory Committee's admonition that "a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention)," plaintiffs—who complain that the government's defense of this suit was vexatious, oppressive, and abusive from the moment the answer was filed—did not seek sanctions against

defendant until after final judgment was entered in their favor. See Pls.' Reply 1 ("Moving to have the Government sanctioned when Defendant filed its Answer before Plaintiffs won or lost seemed wholly premature and certainly they should not be penalized."). If plaintiffs believed that the government was defending this suit "for an improper purpose," RCFC 11(b)(1), they should have sought relief upon receipt of defendant's cross-motion for summary judgment (at the latest). Similarly, if plaintiffs believed that the government was advancing unsupported or frivolous legal arguments in the briefs it filed in this court, they should have sought relief upon the filing of those briefs. Plaintiffs' decision to wait until they obtained final judgment in their favor before invoking RCFC 11 is fatal to their motion.

But even if plaintiffs' RCFC 11 motion were procedurally proper, it is wholly without merit. Defendant did not abandon a settlement with plaintiffs because there was no settlement to abandon. As the court noted in its trial decision, before they filed suit in this court, plaintiffs appealed the denial of their refund claim to the IRS Office of Appeals, and the appeals officer, Mr. Kaplon, concluded that they had sustained a theft loss in 2004. However, as plaintiffs acknowledge, the proposed settlement was never finalized. Indeed, Mr. Kaplon testified during the trial that he lacked authority to enter into a settlement and that any proposed settlements required the approval of a manager. Trial Tr. 455; accord Estate of Akin v. United States, 31 Fed. Cl. 89, 94-95, aff'd, 43 F.3d 1487 (Fed. Cir. 1994) (unpublished table decision); Johnson v. Comm'r, 136 T.C. 475, 496-97 (2011), aff'd per curiam, 502 F. App'x 1 (D.C. Cir. 2013). Furthermore, as plaintiffs also recognize, Mr. Kaplon's opinions regarding whether and when plaintiffs incurred a theft loss are not binding in subsequent litigation. See Tucker v. Comm'r, 135 T.C. 114, 164 (2010) ("[D]eterminations with respect to underlying liability by the personnel of the Office of Appeals are not binding on the IRS and may be overturned during audit reconsideration or overruled by the IRS Office of Chief Counsel in taking litigation positions or settling cases."), aff'd, 676 F.3d 1129 (D.C. Cir. 2012); cf. Garity v. United States, Civil No. 9-72624, 1980 WL 1765, at *2 (E.D. Mich. 1980) ("[T]he opinions, impressions, conclusions and reasoning of IRS agents are irrelevant to the validity of the assessment against plaintiff. . . . Resolution of these issues depends solely on application of the pertinent law to the facts of this case; . . . the opinions of individual IRS agents regarding their propriety are immaterial."), quoted in Flamingo Fishing Corp. v. United States, 31 Fed. Cl. 655, 658 (1994). Thus, the government did not violate RCFC 11 by challenging plaintiffs' contentions that they were entitled to claim a theft loss and that they could claim the theft loss in 2004.[2]

---

[2] Further, although plaintiffs did not invoke the court's inherent authority to impose sanctions for misconduct, Chambers, 501 U.S. at 44, the court sees no basis for exercising such authority in this matter. The government is entitled to a vigorous defense, even if it ultimately loses the case. See, e.g., United States v. Figueroa-Arenas, 292 F.3d 276, 279 (1st Cir. 2002) ("[A] judge's power to sanction an attorney . . . cannot be used to chill vigorous but legitimate advocacy[, and] a judge should resort to [sanctions] only when reasonably necessary—and then with due circumspection."); Quantlab Techs. Ltd. (BVI) v. Godlevsky, 317 F. Supp. 3d 943, 950 (S.D. Tex. 2018) ("[A]ll defendants, even those eventually and correctly found fully liable, are entitled to mount a vigorous defense."); see also Kaffenberger v. United States, 314 F.3d 944, 960 (8th Cir. 2003) ("Our judicial system allows all litigants, including the IRS, to litigate their differences through trial if the parties cannot settle them.").

In sum, the court denies plaintiffs' motion for RCFC 11 sanctions as procedurally improper and, in the alternative, as without merit.

## B. Request for Attorney's Fees Under I.R.C. § 7430

As an alternative to sanctions under RCFC 11, plaintiffs seek an award of attorney's fees under I.R.C. § 7430.

### 1. Eligibility for Attorney's Fees

#### a. Legal Standard

A taxpayer who prevails against the United States in a tax refund suit may, after exhausting available administrative remedies, obtain a judgment for attorney's fees and costs. I.R.C. § 7430(a)-(b). To qualify as a "prevailing party," a taxpayer must (1) have "substantially prevailed with respect to the amount in controversy" or "substantially prevailed with respect to the most significant issue or set of issues presented"; (2) have timely submitted an application for attorney's fees that demonstrates that the taxpayer is a prevailing party, identifies the amount sought, and includes an itemized statement for each of the taxpayer's attorneys specifying the hours expended and the rate at which the fees were computed; and (3) satisfy specified net worth requirements. Id. § 7430(c)(4)(A) (citing 28 U.S.C. § 2412(d)(1)(B), (2)(B)). However, a taxpayer "shall not be treated as the prevailing party . . . if the United States establishes that the position of the United States in the proceeding was substantially justified." Id. § 7430(c)(4)(B)(i); see also id. § 7430(c)(7) (indicating that the "position of the United States" includes both "the position taken by the United States in a judicial proceeding" and "the position taken in an administrative proceeding"). "In determining . . . whether the position of the United States was substantially justified, the court shall take into account whether the United States has lost in courts of appeal for other circuits on substantially similar issues." Id. § 7430(c)(4)(B)(iii).

For a court to conclude that the United States' position was substantially justified, the position must be "justified to a degree that could satisfy a reasonable person."[3] Pierce v. Underwood, 487 U.S. 552, 565 (1988); accord id. at 566 n.2 ("[A] position can be justified even though it is not correct, and we believe it can be substantially (i.e., for the most part) justified if a

---

[3] Many of the provisions of I.R.C. § 7430 are similar to those in the Equal Access for Justice Act ("EAJA"). Compare 28 U.S.C. § 2412(a)-(b), with I.R.C. § 7430(b). Consequently, courts consider case law construing the EAJA to be instructive when assessing a request for attorney's fees and costs under I.R.C. § 7430. See Nat'l Org. for Marriage, Inc. v. United States, 807 F.3d 592, 597 n.4 (4th Cir. 2015); First Interstate Bank of Cal. v. Purewell Inv., Inc., 76 F.3d 386 (9th Cir. 1996) (unpublished table decision); Lennox v. Comm'r, 998 F.2d 244, 248 n.4 (5th Cir. 1993); Kenagy v. United States, 942 F.2d 459, 464 (8th Cir. 1991); Larsen v. United States, 39 Fed. Cl. 162, 167 n.9 (1997), appeal dismissed, 152 F.3d 945 (Fed. Cir. 1998) (unpublished table order); Pohl Corp. v. United States, 29 Fed. Cl. 66, 71-72 (1993), appeal dismissed, 36 F.3d 1110 (Fed. Cir. 1994) (unpublished table order); cf. Starry Assocs., Inc. v. United States, 892 F.3d 1372, 1383-84 (Fed. Cir. 2018) (discussing, in a case concerning the EAJA, a decision of another circuit court of appeals that addressed I.R.C. § 7430).

reasonable person could think it correct, that is, if it has a reasonable basis in law and fact."); <u>see also id.</u> at 566 ("To be 'substantially justified' means . . . more than merely undeserving of sanctions for frivolousness[.]").  Because courts examine "the entirety of the government's conduct" in determining whether "the overall position of the United States" was substantially justified, <u>Chiu v. United States</u>, 948 F.2d 711, 715 (Fed. Cir. 1991), a court may determine that the government's position was not substantially justified if the government's justified conduct is outweighed by its unjustified conduct, <u>see id.</u> at 715 n.4 ("It is for the trial court to weigh each position taken and conclude which way the scale tips . . . .").  The decision to award attorney's fees is within the discretion of the trial court.  <u>BASR P'ship v. United States</u>, 915 F.3d 771, 783 (Fed. Cir. 2019) ("We . . . review the trial court's decision to award . . . litigation costs under I.R.C. § 7430 for an abuse of discretion."); <u>accord</u> <u>RAMCOR Servs. Grp., Inc. v. United States</u>, 185 F.3d 1286, 1290 (Fed. Cir. 1999) ("The trial judge enjoys considerable discretion to determine eligibility for an EAJA award."); <u>Chiu</u>, 948 F.2d at 715 n.4 ("[Determining whether the overall position of the United States is substantially justified under the EAJA] is quintessentially discretionary in nature.").

### b.  Plaintiffs May Obtain Attorney's Fees

With respect to plaintiffs' eligibility to obtain attorney's fees pursuant to I.R.C. § 7430, there is no dispute—and the court finds—that plaintiffs exhausted their administrative remedies, substantially prevailed in this case, timely submitted a motion for attorney's fees that specified the hours expended and rates requested, and satisfy the statute's net worth requirements.  Where the parties depart, however, is the issue of substantial justification.[4]

In their motion, plaintiffs contend that defendant's position in this case was not substantially justified, as a general matter, because defendant engaged in abusive behavior by litigating the case despite the existence of a settlement with the IRS that resolved the two primary issues involved in their refund claim:  whether plaintiffs experienced a theft loss and, if

---

[4]  Plaintiffs also imply that they are prevailing parties under an exception to the substantial justification requirement:

A party to a court proceeding . . . shall be treated as the prevailing party if the liability of the taxpayer pursuant to the judgment in the proceeding (determined without regard to interest) is equal to or less than the liability of the taxpayer which would have been so determined if the United States had accepted a qualified offer of the party under subsection (g).

I.R.C. § 7430(c)(4)(E)(i); <u>see also id.</u> § 7430(g) (defining "qualified offer" and "qualified offer period").  Specifically, they contend that "they made a qualified offer during the qualified offer period" by accepting Mr. Kaplon's "counter-offer," and that the purported counteroffer "remained open for at least two years while settlement negotiat[ions] were made [sic]."  Pls.' Mot. 10; <u>see also id.</u> (asserting that "[a]t no point was there ever an offer from the Government to accept the already agreed upon settlement").  However, a qualified offer must be made in writing and specifically designated as a "qualified offer," I.R.C. § 7430(g), and the trial record lacks any evidence that such a document exists.  Consequently, plaintiffs' contention is not creditable.

they did, whether they could claim the theft loss on their 2004 federal income tax return. They further contend that defendant's position was not substantially justified on the merits of either issue. With respect to the existence of a theft loss, plaintiffs argue that defendant's position was premised on a single decision in a case with "radically different" facts, and observe that defendant ultimately conceded the existence of a theft loss two-and-one-half years after they filed suit during proceedings on summary judgment. With respect to the year that they could claim the theft loss, plaintiffs remark that the Federal Circuit twice rejected defendant's position and that defendant did not attempt to establish a year of loss other than 2004.

Defendant, which has the burden of proof on this issue, responds that its position in this case was substantially justified. It asserts that it initially contested whether a theft loss existed because the parties' dispute was focused on whether a theft had occurred under state law, but during summary judgment proceedings, it decided to concede the issue because, among other reasons, Judge Allegra issued a decision in Goeller in which he concluded that federal common law, and not state law, governed whether a theft occurred. It further remarks that this court held that certain losses did not constitute theft losses—a holding not appealed by plaintiffs.

Regarding the year that plaintiffs could claim the theft loss for federal income tax purposes, defendant argues that plaintiffs based their decision to claim their loss in 2004 on the fact that they abandoned their arbitration claim in 2003, and therefore it was entitled to contest plaintiffs' ability to present the objective evidence required by the relevant Treasury regulation regarding their reasonable prospect of recovering their losses in 2004. Defendant also notes that this court ruled in its favor after trial, and that the Federal Circuit remanded the case because it did not agree with its—and this court's—interpretation of the "breadth" of the Treasury regulation, instead agreeing with the interpretation advanced by the United States Courts of Appeals for the Sixth and Tenth Circuits. Def.'s Resp. 24-25 (citing Vincentini v. Comm'r, 429 F. App'x 560 (6th Cir. 2011) (unpublished decision); Jeppsen v. Comm'r, 128 F.3d 1410 (10th Cir. 1997)); accord id. at 35 (asserting that "the Federal Circuit did not express an opinion on the merits" but instead "remanded for a more 'holistic' determination of the facts and circumstances" (quoting Adkins, 856 F.3d at 920)). In addition, defendant observes that (1) on remand, it relied on the "simply unknowable" framework for determining a taxpayer's reasonable prospect of recovery that had been endorsed in Jeppsen and Vincentini, (2) plaintiffs had not challenged this framework when defendant noted it during summary judgment proceedings and in its posttrial briefing, (3) this court agreed with its invocation of the "simply unknowable" framework, (4) criminal proceedings related to the underlying securities fraud were just beginning in 2004 and it was unknown at that time whether plaintiffs' losses could be recovered from the criminal defendants, and (5) the Federal Circuit based its reversal of this court's decision on its rejection of the "simply unknowable" framework, explaining that it agreed with the dissent in Jeppsen on this issue. Finally, defendant asserts that because plaintiffs had the burden of proving that they could claim a theft loss in a particular year, it was not required to establish that a year other than the one urged by plaintiffs was the proper year to claim the theft loss.

Defendant then addressed plaintiffs' contention that it lacked substantial justification to litigate the case in light of the IRS's purported settlement of the issues that were ultimately decided in plaintiffs' favor by the Federal Circuit. It notes, as it did in its opposition to plaintiffs'

RCFC 11 motion, that a settlement did not exist in this case. It also asserts that plaintiffs' characterization of Mr. Kaplon's efforts incorrectly presupposes that Mr. Kaplon was a factfinder rather than someone charged with settling cases, and that its litigating position was consistent with the position taken by the Internal Revenue Agent who investigated, and denied, plaintiffs' refund claim. In addition, it notes that plaintiffs did not need to file suit, but could have instead requested that the IRS extend the deadline for filing suit.

As noted above, when assessing whether the overall position of the United States was substantially justified, the court examines the various positions taken by defendant during the litigation and determines whether, as a whole, the substantially justified positions outweigh the positions that were not substantially justified. Chiu, 948 F.2d at 715 & n.4. In their briefs, the parties address whether defendant's position was substantially justified with respect to (1) litigating the case notwithstanding Mr. Kaplon's proposed settlement, (2) contesting whether a theft occurred under state law, and (3) contesting whether 2004 was the proper year for plaintiffs to claim a theft loss.

The first two positions require little analysis. As the court previously remarked, the trial record lacks any evidence that plaintiffs and the IRS executed a settlement agreement. Moreover, neither the IRS nor the United States Department of Justice is bound by the not-yet-approved recommendations of an IRS Appeals Officer. Therefore, a reasonable person could believe that defendant was justified in litigating plaintiffs' suit.

Defendant's decision to contest whether a theft occurred under state law was also substantially justified. Under the precedent that existed at the time plaintiffs filed suit, state law definitions of "theft" controlled whether a theft occurred under I.R.C. § 165. Defendant was entirely justified in contesting whether the state law definition of "theft" applicable in this case included stock manipulation schemes. Indeed, defendant would have been justified in continuing to contest the issue after Judge Allegra issued his decision in Goeller since that decision would not have bound this court. See also Rochlis v. United States, 146 Fed. Cl. 743, 775-77 (2020) (declining to follow Goeller in concluding that state law controls whether a theft occurred).

The substantial justification analysis is more complex with respect to the third position of the United States discussed by the parties—that 2004 was not the proper year for plaintiffs to claim the theft loss. The court begins by examining the "objective indicia" of the strength of defendant's position. Pierce, 487 U.S. at 568; Nat'l Org. for Marriage, 807 F.3d at 597. Those indicia include the trial and remand decisions that this court issued in defendant's favor, the existence of supporting precedent from other circuit courts of appeals (namely Jeppsen), the lack of contrary precedent from other appellate courts, and the Federal Circuit's resounding rejection of defendant's position in its most recent decision in this case. It is this final factor that tips the balance in plaintiffs' favor.[5]

---

[5] Because the "objective indicia" weigh against defendant, there is no need to proceed to the second step of the analysis—a consideration of "the actual merits of the Government's litigating position." Pierce, 487 U.S. at 569; accord Nat'l Org. for Marriage, 807 F.3d at 598. Indeed, as described below, the Federal Circuit conclusively determined that defendant's position was not meritorious. See Adkins, 960 F.3d at 1361-68.

In its most recent decision, the Federal Circuit could not have been clearer that this court—and, by extension, defendant, whose position this court adopted—incorrectly interpreted the applicable Treasury regulation.  See, e.g., Adkins, 960 F.3d at 1354 ("[T]he Claims Court . . . misconstrued a taxpayer's legal obligations in this tax refund context and thus, required too much with respect to the showing required . . . .").  Specifically, the Federal Circuit determined that it was "legally erroneous" for this court to assess whether plaintiffs' prospect of recovering their losses in 2004 was unknowable, id. at 1362, remarking that doing so "is at best confusingly unhelpful and at worst incorrect," id. at 1363.  It further stated that this "new standard . . . ignores the plain language of the regulation, heightens the evidentiary burden on the taxpayer, and punishes the victim for any factual ambiguity."  Id. at 1364; see also id. at 1363 (remarking that the "regulation is clear").

Additionally, the Federal Circuit concluded, upon its review of the record, that this court's fact findings regarding whether plaintiffs had a reasonable prospect of recovering their losses in 2004 were "clearly erroneous."  Id. at 1366.  It observed that this court "pointed to possible avenues of recovery but did not calculate either the cost of pursuing that recovery or attempt to balance those costs against the likelihood of victory," and then commented that "[w]hile a taxpayer is not free to put her head in the sand and ignore meaningful avenues of recovery, it would be a tremendous waste of resources and time for the taxpayer to pursue every option, regardless of the likelihood of success or degree of difficulty."  Id. at 1365; accord Oral Argument at 18:28, Adkins, 960 F.3d at 1352 (No. 19-1356), http://oralarguments.cafc.uscourts. gov/default.aspx?fl=2019-1356.mp3 (expressing concern that plaintiffs would be forced, under this court's and defendant's approach, to "spend a ton of time and money to get a pittance").  The Federal Circuit considered the avenues of recovery discussed by this court—and which had been raised by defendant—and concluded that there was "overwhelming evidence" that plaintiffs lacked a reasonable prospect of recovering their losses in 2004.  Adkins, 960 F.3d at 1366-68.

Other courts have found such an emphatic rejection of the United States' position to be an important factor in determining whether the position was substantially justified.  For example, in In re Long–Distance Telephone Service Federal Excise Tax Refund Litigation, the United States Court of Appeals for the District of Columbia Circuit stated that it was reasonable to conclude that a federal agency's position is not substantially justified when an appellate decision describes it "in harsh terms."  751 F.3d 629, 637 (D.C. Cir. 2014).  And, two years earlier, that same court, after describing the numerous ways in which a federal agency's order was arbitrary and capricious, concluded that the agency's position was not substantially justified.  LePage's 2000, Inc. v. Postal Regul. Comm'n, 674 F.3d 862, 867-68 (D.C. Cir. 2012).  Of course, losing a case does not automatically mean that the United States' position was not substantially justified.  See Broad Ave. Laundry & Tailoring v. United States, 693 F.2d 1387, 1391 (Fed. Cir. 1982), superseded by statute on other grounds, Act of Aug. 5, 1985, Pub. L. 99-80, 99 Stat. 183; accord United States v. Paisley, 957 F.2d 1161, 1167 (4th Cir 1992).

But [merits decisions in a litigation]—and more critically their rationales—are the most powerful available indicators of the strength, hence reasonableness, of the ultimately rejected position.  As such, they obviously must be taken into account both by a district court in deciding whether the Government's position, though

ultimately rejected on the merits, was substantially justified, and by a court of
appeals in later reviewing that decision for abuse of discretion.

Paisley, 957 F.2d at 1167.

In this case, the Federal Circuit based its denunciation of the United States' position
(adopted by this court) on its conclusion that the United States (and this court) plainly
misinterpreted the relevant Treasury regulation.  Misinterpretation of a regulation has been found
by other courts to render the United States' position unreasonable.  See, e.g., Huckaby v. U.S.
Dep't of the Treasury, 804 F.2d 297, 299 (5th Cir. 1986) (rejecting the argument that the
"government position cannot be unreasonable if a district court rules in its favor" when "the
district court simply misconstrues the statute and underlying regulations," and remarking that it
"rejected the interpretation of [the relevant statute] which the government urged successfully
upon the district court . . . as being contrary to clear statutory intent, and further noted it would
lead to absurd results"); see also Patrick v. Shinseki, 668 F.3d 1325, 1330-31 (Fed. Cir. 2011)
("Where . . . the government interprets a statute in a manner that is contrary to its plain language
and unsupported by its legislative history, it will prove difficult to establish substantial
justification."); id. at 1333 ("[T]he [United States Court of Appeals for Veterans Claims] did not
discuss, and apparently did not consider, the fact that the government had adopted an
interpretation of [the statute at issue] that was wholly unsupported by either the plain language of
the statute or its legislative history."); Pate v. United States, 982 F.2d 457, 459 (10th Cir. 1993)
("[T]he fact that the district court ruled in favor of the IRS is not dispositive as the district court
did not apply established [state] law.").  In short, the Federal Circuit's rationale for its
conclusions and unambiguous condemnation of the United States' position significantly
outweigh any objective indicia favoring the strength of the United States' position, rendering that
position substantially unjustified.

The final step in the substantial justification analysis is an assessment of the relative
importance of the three positions of the United States at issue—(1) to litigate the case
notwithstanding Mr. Kaplon's proposed settlement, (2) to contest whether a theft occurred under
state law, and (3) to contest whether 2004 was the proper year for plaintiffs to claim the theft
loss—to determine whether, overall, the position of the United States was substantially justified.
The most important issue throughout the more-than-ten-year history of this case was the year
plaintiffs could claim their theft loss.  This issue was the main subject of a summary judgment
decision, a trial, two trial decisions, and two appeals.  It therefore stands to reason that whether
defendant's position on this issue was substantially justified deserves the greatest weight in
determining whether the United States' overall position was substantially justified.  Adopting
this reasoning, the court concludes that because defendant's position regarding the proper year
for plaintiffs to claim a theft loss was not substantially justified, defendant's overall position was
not substantially justified.  Consequently, plaintiffs are prevailing parties entitled to an award of
attorney's fees under I.R.C. § 7430.

## 2. Amount of Attorney's Fees

### a. Legal Standard

Having concluded that an award of attorney's fees is proper in this case, the court must determine the precise amount of attorney's fees to which plaintiffs are entitled. Under I.R.C. § 7430, plaintiffs are entitled to

> reasonable fees paid or incurred for the services of attorneys in connection with the court proceeding, except that such fees shall not be in excess of $125 per hour unless the court determines that a special factor, such as the limited availability of qualified attorneys for such proceeding, the difficulty of the issues presented in the case, or the local availability of tax expertise, justifies a higher rate.

I.R.C. § 7430(c)(1)(B)(iii). The $125 hourly rate is adjusted for increases in the cost of living. See id. § 7430(c)(1)(B). Consequently, the cap was $180 per hour for 2010 to 2012, Rev. Proc. 2009-50; Rev. Proc. 2010-40; Rev. Proc. 2011-52; $190 for 2013 and 2014, Rev. Proc. 2012-41; Rev. Proc. 2013-35; $200 for 2015 to 2019, Rev. Proc. 2014-61; Rev. Proc. 2015-53; Rev. Proc. 2016-55; Rev. Proc. 2017-58; Rev. Proc. 2018-57; and $210 for 2020, Rev. Proc. 2019-44. Moreover, "the 'special factor' formulation suggests Congress thought that [the capped amount] was generally quite enough public reimbursement for lawyers' fees, whatever the local or national market might be." Pierce, 487 U.S. at 572.

"[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). To satisfy that burden under I.R.C. § 7430, which incorporates by reference the pertinent section of the EAJA, the fee applicant must submit "an itemized statement from any attorney . . . representing . . . the party stating the actual time expended and the rate at which fees and other expenses were computed." 28 U.S.C. § 2412(d)(1)(B); accord Owen v. United States, 861 F.2d 1273, 1275 (Fed. Cir. 1988) (en banc) (per curiam) ("[T]he Supreme Court decision in Hensley . . . required a full itemization for statutory compliance of any claim for attorney fees sought for a prevailing party. We have adhered to this requirement."). "[C]ontemporaneous records of attorney's time and usual billing rates . . . are necessary in order to determine the reasonableness of the charges." Naporano Iron & Metal Co. v. United States, 825 F.2d 403, 404 (Fed. Cir. 1987). But see TGS Int'l, Inc. v. United States, 983 F.2d 229, 230 n.1 (Fed. Cir. 1993) (accepting an "itemized computation . . . showing the date, the hours expended, and an identification of the work done in each time increment" that apparently was not created contemporaneously with the work performed). These records should "identify the general subject matter of [the] time expenditures," but need not reflect "in great detail how each minute . . . was expended." Hensley, 461 U.S. at 437 n.12. The trial court "has discretion in determining the amount of a fee award." Id. at 437.

### b. The Hourly Rates Requested by Plaintiffs Are Excessive

Plaintiffs seek an award of attorney's fees in the amount of $185,330.40, which represents (1) 248.82 hours at $325 per hour for time expended until the first appeal ($79,770.00) and (2) 145.2 hours at $727 per hour for time expended thereafter ($105,560.40).[6]

With respect to the hourly rate, plaintiffs contend in their motion—and reassert in their reply—that the appropriate rate should be determined by reference to a version of the Laffey Matrix, which is a survey "of reasonable rates for attorneys in the Washington, D.C. metropolitan area . . . engaged in complex federal litigation" that was prepared by the United States District Court for the District of Columbia. Biery v. United States, 818 F.3d 704, 712 (Fed. Cir. 2016). However, as defendant observes, the Laffey Matrix (or its variations) is not applicable when determining reasonable attorney's fees in tax refund cases. Rather, the statute governing attorney's fees in tax refund cases, I.R.C. § 7430, expressly caps the hourly rate at a cost-of-living-adjusted $125. And although I.R.C. § 7430 allows for an upward adjustment of the hourly rate if there is a "special factor," plaintiffs have not asserted that such a factor exists in this case. But to the extent they are so arguing, the fact that their attorneys are experienced tax litigators is not a special factor justifying an increase in the cap set by I.R.C. § 7430. See, e.g., Cassuto v. Comm'r, 936 F.2d 736, 743 (2d Cir. 1991) ("Section 7430 applies only to tax cases; therefore most of the applications for attorneys' fees under it would be to pay attorneys who have brought or defended tax cases. Such lawyers presumably all have a certain degree of 'tax expertise.' To suppose that Congress intended them all to be paid at a higher than $[125] an hour rate would allow this 'special factor' exception to swallow the $[125] an hour rule."); Pohl Corp., 29 Fed. Cl. at 75 ("While [the plaintiff's] two attorneys may be, as is claimed, tax specialists, this does not entitle [the plaintiff] to a fee in excess of the statutory rate."). Consequently, the maximum amount that plaintiffs could recover for attorney's fees is $77,247.10, broken down as follows:

| Year | Rate | Hours Requested | Amount |
|------|------|------|------|
| 2010 | $180 | 2.00 | $360.00 |
| 2011 | $180 | 6.82 | $1227.60 |
| 2012 | $180 | 18.60 | $3348.00 |
| 2013 | $190 | 11.10 | $2109.00 |
| 2014 | $190 | 106.80 | $20,292.00 |
| 2015 | $200 | 103.50 | $20,700.00 |
| 2016 | $200 | 72.50 | $14,500.00 |
| 2017 | $200 | 26.00 | $5200.00 |
| 2018 | $200 | 12.80 | $2560.00 |
| 2019 | $200 | 16.85 | $3370.00 |

---

[6] For the second time period, plaintiffs' counsel only billed plaintiffs $25,000, with any further recovery of attorney's fees to be paid on a contingent basis. Plaintiffs seek both the $25,000 they paid counsel and the $80,560.40 balance.

| 2020 | $210 | 17.05 | $3580.50 |
| Totals | | 394.02 | $77,247.10 |

### c. Plaintiffs Did Not Adequately Demonstrate the Reasonableness of Some of the Requested Attorney's Fees

Turning to the time expended by counsel in litigating this case, plaintiffs only briefly address the reasonableness of the number of hours for which their counsel is requesting attorney's fees. The relevant section in their motion reads, in its entirety:

C. The Hours For Which Plaintiff Is Seeking Fees Are Reasonable.

The hours worked by each of the firms/lawyers representing Plaintiff in this action are set forth in the accompanying attorney statements. Each of those statements also reflects the fact that the attorneys and firms have exercised billing judgment. See Exhibit B.

Exhibit B is divided into two parts—one for work performed before the first appeal and one for all subsequent work—and the sole content of each part is a table setting forth counsel's billing entries. Pls.' Ex. B. The tables include the following columns: "Code," "Date," "Employee," "Bill," "Hours On," "Rate On," "Amount On Bill," and "Narrative."[7] Id.

Defendant, in its response, contends that many of the entries in Exhibit B are deficient, and also challenges the sufficiency of Exhibit B altogether. The purported deficiencies include vague and generic descriptions, unreasonable or unnecessary work, questionable work, work that could have been performed by a paralegal that was billed at an attorney's hourly rate, and purely administrative work. As for the overall sufficiency of Exhibit B, defendant observes that the tables in the exhibit bear no indication that the entries were created contemporaneously with the work to which they pertain.

In their reply, plaintiffs do not respond to defendant's specific objections, their counsel instead declaring:

The awarding of fees is in the sound discretion of the Court. The descriptions were what was tendered to and agreed to by the client and for work done. If that work had not been done, I would not have put it into the motion and signed the motion. The Court is of course free to accept or deny any line item in its discretion.

Pls.' Reply 11. Plaintiffs' failure to address defendant's objections hampers the court's ability to

---

[7] Plaintiffs do not explain the significance of the numbers in the "Code" column ("00002" or "00003"), and it appears that the numbers in the "Bill" column are invoice numbers. Also, the court presumes that the "Hours On" and "Rate On" column names are incomplete, and should be "Hours On Bill" and "Rates On Bill."

assess the reasonableness of their claimed attorney's fees. Plaintiffs have the burden of establishing the amount of attorney's fees to which they are entitled, and therefore well-founded, unrebutted objections asserted by defendant will preclude their recovery of the affected amounts.

Defendant's first objection is that many of the descriptions of the work performed are vague and generic, making it difficult or impossible to assess the reasonableness of the hours expended. It highlights several representative descriptions: "Review cases" on August 11, 2011, "Prepare Memo" on November 28, 2012, "Emails with client" on January 14, 2014, "Review documents" on June 11, 2014, and "Confer with Rinzel" on October 22, 2016. Defendant requests that all entries with such descriptions be excluded from any attorney's fee award.

The court agrees with defendant that many of the entries in Exhibit B include descriptions that lack the detail necessary to assess the reasonableness of the associated charges. Such an assessment requires plaintiffs to describe the "specific task performed," Naporano, 825 F.2d at 404, with sufficient detail. See Avgoustis v. Shinseki, 639 F.3d 1340, 1344 (Fed. Cir. 2011) (remarking that the "specificity requirements" that led to the rejection of payment for "'writing to client,' 'reviewing Court's notice of docketing,' 'reviewing litigation file,' '[t]elephone conversations with VA counsel,' and 'faxing materials to VA counsel,'" were "in accordance with [precedent] from the Supreme Court, our circuit, and other circuits"); Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 971 (D.C. Cir. 2004) ("Similarly inadequate are the numerous entries in which attorneys billed simply for 'research' and 'writing,' or for time spent in teleconferences or meetings . . . the purposes of which are not provided."); McCarty v. United States, 142 Fed. Cl. 616, 628 (2019) ("[T]he following recurring vague entries lack sufficient detail to permit effective review: 'Client correspondence,' 'Work on expert issues,' 'Research case,' 'Strategize re: most efficient way to resolve case,' 'Review pleadings,' 'Work on mapping issues,' and 'Work on matters re: recovery of fees[.]'"); Greenhill v. United States, 96 Fed. Cl. 771, 781 (2011) ("Several of [counsel's] time records . . . lack enough specificity for the Court to determine whether those hours were reasonably expended."). A review of Exhibit B indicates that the descriptions in at least 60 of the 277 total entries, representing $11,326.00 in attorney's fees, are too vague to assess the reasonableness of the work performed.[8] Accordingly, the court reduces the fee award by $11,326.00.

Defendant's second objection is that certain entries are unreasonable or unnecessary on their face, such as those spent researching the United States Department of Justice attorney

---

[8] In addition to the descriptions identified by defendant as vague, the court considers descriptions such as "review letters," "review documents," and "review and respond to emails" to be insufficiently detailed to allow for a determination of the reasonableness of the associated charges. Some of the entries with these descriptions also include descriptions of other tasks— both vague and not vague—performed in the same time increment. Plaintiffs do not explain how much time was spent doing each task, and the court declines to guess. See also McCarty, 142 Fed. Cl. at 628 ("Block billing entails 'lumping tasks together in time entries rather than making such entries task-by-task.' Block billing poses the same difficulties as vague entries, in that it prevents the Court from determining whether the claimed hours are reasonable due to the lack of detail." (quoting McAfee v. Boczar, 738 F.3d 81, 90 (4th Cir. 2013))). Thus, the court excludes all fees charged for such entries.

assigned to defend the case and those spent revising briefs, often after consulting with plaintiffs. Defendant thus requests that all such entries be excluded from any attorney's fee award. Because plaintiffs did not explain why researching defense counsel was a reasonable expenditure of time in furtherance of their tax refund claim, the court reduces the fee award by the $140.00 claimed for these entries. However, with respect to the time for revising briefs, it is relatively simple to compare the entries challenged by defendant with the case's docket to determine which briefs were being revised,[9] and defendant does not supply any legal authority for its suggestion that attorneys should not revise their briefs after consulting with their clients. The identity of the brief being revised in the December 29, 2014 entry is unclear, and thus the court deducts the $190.00 in attorneys' fees claimed for that entry. In contrast, the court finds it reasonable for counsel to have spent 10.5 hours revising plaintiffs' opening posttrial brief in January 2015, 7.7 hours revising plaintiffs' responsive posttrial brief in May and July 2015, and 3.5 hours revising plaintiffs' appellate brief in June 2016. Therefore, the court will not disturb the amounts claimed in these entries.

Defendant's third objection is that entries reflecting communications with the IRS are, at a minimum, questionable because counsel would have had no reason to communicate with the IRS regarding plaintiffs' theft loss once plaintiffs filed their complaint in this court. Defendant also identifies as questionable an entry for four hours of time that has no description for how the time was spent. Plaintiffs do not attempt to explain why they would have needed to communicate directly with the IRS regarding their contested refund claim;[10] indeed, any such communications would have been, at best, unproductive, see, e.g., I.R.C. § 7122(a) ("The Secretary may compromise any civil or criminal case arising under the internal revenue laws prior to reference to the Department of Justice for prosecution or defense; and the Attorney General or his delegate may compromise any such case after reference to the Department of Justice for prosecution or defense."). Because plaintiffs offered no evidence that these communications were made "in connection with the court proceeding," id. § 7430(c)(1)(iii), the court reduces the fee award by the $725.00 claimed for these entries. The court also reduces the fee award by the $840.00 claimed for work performed on February 2, 2020, because no description for that work was provided.

Defendant's fourth objection is that many of the entries are for work performed by an attorney at the attorney's hourly rate, but that could have been performed by a paralegal at a paralegal's hourly rate. These entries include:

---

[9] This comparison should not be necessary, however. See Naporano, 825 F.2d at 405 (recounting the plaintiff's argument "that the Claims Court could have read the documentation in its fee application together with the Claims Court's docket sheet and therefore determined the specific work involved in any given bill" and then "reject[ing] unequivocally any suggestion that the Claims Court had an obligation to reconstruct the bills for [the plaintiff]").

[10] In their reply, plaintiffs cryptically comment that "[t]he 2009 issues dealt with the impact of this case the Adkins 2009 filings [sic]," Pls.' Reply 12, but provide no context for this comment. Moreover, none of the entries challenged by defendant mentions the year 2009, and the 2009 tax year was not at issue in this case.

| Date | Hours | Rate | Amount | Description |
|---|---|---|---|---|
| 12/10/2010 | 1.0 | $180.00 | $180.00 | File Pleading. |
| 10/23/2012 | 1.5 | $180.00 | $270.00 | File Motion. |
| 9/2/2014 | 0.8 | $190.00 | $152.00 | Telephone conference with client and file pleading. |
| 12/1/2014 | 0.5 | $190.00 | $95.00 | File pleading. |
| 1/23/2015 | 1.2 | $200.00 | $240.00 | Finalize and file brief with Court. |
| 6/25/2015 | 2.0 | $200.00 | $400.00 | Support Mauler, review emails from client, prepare record citations. |
| 6/28/2015 | 1.5 | $200.00 | $300.00 | Review draft brief, suggest edits, assist with citations, and review and respond to emails. |
| 6/29/2015 | 3.1 | $200.00 | $620.00 | Prepare 2003 argument, prepare record citations, review and respond to emails, review and revise draft. |
| 4/22/2016 | 1.0 | $200.00 | $200.00 | Prepare and file notice of appeal. |
| 5/3/2016 | 0.5 | $200.00 | $100.00 | Docket appeal. |
| 5/9/2016 | 1.0 | $200.00 | $200.00 | Prepare and file docketing statement. |
| 2/14/2017 | 0.75 | $200.00 | $150.00 | File Hearing designations with Appeals Court. |
| 6/26/2019 | 1.8 | $200.00 | $360.00 | Teleconference with client, coordinate filing of brief with printer, prepare Appendix for filing. |
| 6/27/2019 | 0.7 | $200.00 | $140.00 | Prepare Appendix. |
| 7/1/2019 | 0.7 | $200.00 | $140.00 | Finalize appendix references. |
| 7/2/2019 | 0.5 | $200.00 | $100.00 | Finalize appendix and email printer. |
| 1/13/2020 | 1.0 | $210.00 | $210.00 | Prepare and e-file notice of argument with court. |
| Totals | 19.55 | | $3857.00 | |

Although defendant contends that these tasks should be compensated at a paralegal's hourly rate, it does not suggest what that rate should be, and plaintiffs, in their reply, do not address defendant's contention at all. In the absence of any evidence regarding the proper hourly rate, the need for an attorney to perform these tasks, or why these tasks took so long to perform (e.g., 1.5 hours to file a motion), the court will make a 50% across-the-board reduction of the hours claimed to perform these tasks. That reduction equates to a $1928.50 deduction from plaintiffs' fee award.

Defendant's fifth objection is that plaintiffs have improperly sought reimbursement for performing purely administrative tasks. It challenges four entries on this ground: 1 hour to "[s]end documents" on December 16, 2011, 3.6 hours to "[a]ssemble notebooks with all joint

exhibits for trial" on November 10, 2014, 0.7 hours to "[a]ssemble notebooks of Plaintiffs' Exhibits for trial" on November 11, 2014, and 1.5 hours to "[f]inalize brief for filing, prepare Certificate of Service, Cover sheet, and confer with printer, confer with [sic]" on October 27, 2016. In general, administrative, clerical, and secretarial tasks that could be performed by someone who is not an attorney or paralegal are not compensable. See, e.g., Bratcher v. United States, 136 Fed. Cl. 786, 796 (2018) (collecting cases); Hopi Tribe v. United States, 55 Fed. Cl. 81, 100 (2002) (remarking that "certain expenses," such as secretarial expenses, "may not be recoverable because they are already included within an attorney's hourly rate"). Therefore, the court reduces the fee award by the $1297.00 in charges for these tasks.

Defendant's final contention is that Exhibit B is inadequate to support plaintiffs' request for attorney's fees because there is no indication that the tables in the exhibit were created contemporaneously with the work performed by counsel. Plaintiffs counter this argument with their counsel's representation, in the reply, that plaintiffs accepted and paid for the work based on the descriptions set forth in the exhibit. Although the court is not convinced that such a representation in a brief is sufficient to satisfy the contemporaneity requirement,[11] it will accept the information in Exhibit B, in conjunction with that representation, as minimally adequate evidence of the attorney's fees charged by plaintiffs' counsel.[12] The tables in Exhibit B include "the date, the hours expended, and an identification of the work done in each time increment," TGS Int'l, Inc., 983 F.2d at 230 n.1, and although submission of "[c]ontemporaneously recorded time sheets [is] the preferred practice," Webb v. Bd. of Educ., 471 U.S. 234, 238 n.6 (1985), other documentation can be used to satisfy I.R.C. § 7430's requirement of an "itemized statement," see Rumsey v. Dep't of Just., 866 F.3d 1375, 1379 (Fed. Cir. 2017); TGS Int'l, Inc., 983 F.2d at 230 n.1.

In sum, the court awards attorney's fees to plaintiffs in the amount of $60,800.60, which represents the $77,247.10 requested (when the appropriate hourly rates are used) minus the deductions of $16,446.50 described above.

### III. CONCLUSION

For the reasons set forth above, the court **DENIES** plaintiffs' RCFC 11 motion for sanctions, **GRANTS** plaintiffs' request for attorney's fees under I.R.C. § 7430, and **AWARDS**

---

[11] The court is also unconvinced that counsel's representation is sufficient to establish the reasonableness of any particular entry if the entry is not reasonable on its face. Plaintiffs do not explain why they did not, or could not, supply copies of counsel's time sheets, copies of the invoices sent to plaintiffs, or an affidavit affirming that the entries were derived from counsel's billing records.

[12] The court acknowledges that this conclusion conflicts with one reached in a recent decision by a different United States Court of Federal Claims judge. See Athey v. United States, 149 Fed. Cl. 497, 513 (2020) ("The . . . fee and expense statements submitted appear to have been generated solely for the instant fee dispute, unaccompanied by an affidavit or otherwise satisfying the contemporaneous requirement, and thus cannot be considered 'contemporaneous.'").

plaintiffs attorney's fees under I.R.C. § 7430 in the amount of $60,800.60. The clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Senior Judge